UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
                                        :    21 MC 101 (AKH)
                                        :
IN RE SEPTEMBER 11 LITIGATION           :
                                        :    This Document Relates To:
                                        :    08 CIV 3719
                                        :    08 CIV 3722
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AVIATION DEFENDANTS' STATEMENT PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Civil Rule 56.1(a) of the United States District Court for the

Southern District of New York, the Aviation Defendants[1] respectfully assert, in support

of their Motion for Summary Judgment, that the following material facts are not

genuinely in dispute:

### The 2001 Valuation of the Property

1.      In 1996, the Port Authority of New York and New Jersey (the "Port

Authority") began a process to privatize the World Trade Center complex.  Ex. A to the

Declaration of Desmond T. Barry, Jr. dated June 20, 2008 ("the Barry Decl."), Minutes of

the Bd. of Comm'rs of the Port Auth., at 161 (Apr. 26, 2001).

---

[1]  The Aviation Defendants joining in this motion are: American Airlines, Inc.; AMR
Corporation; United Air Lines, Inc.; UAL Corporation; US Airways Group, Inc.; US
Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; Colgan Air, Inc.; Globe
Aviation Services Corporation; Huntleigh USA Corporation; ICTS International N.V.; The
Boeing Company; and the Massachusetts Port Authority. US Airways, Inc. and US Airways
Group, Inc. join in this motion solely with respect to the PI/WD, PD/BL and WTCP
claimants who have signed the stipulation entered in their bankruptcy cases. The Plan
Injunction remains in effect for all remaining claims. Continental Airlines, Inc. is a property
defendant in the American Airlines Flight 11 Wrongful Death/Personal Injury Litigation
only. Delta Air Lines, Inc. is participating in regard to those claims not stayed, enjoined or
discharged pursuant to Delta Air Lines, Inc.'s bankruptcy proceedings.

2.      To assist in this process, the Port Authority retained investment banking firm J.P. Morgan and property consulting firms Cushman & Wakefield and Milstein Realty Advisors. Ex. B to the Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation, at 2 (Apr. 27, 2001).

3.      The Port Authority's objective was to obtain the maximum value from the transaction for the Port Authority. Working with its consultants, the Port Authority decided to structure the transaction as a long-term net lease. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 161.

4.      The Port Authority broadcast a worldwide request for interest in bidding on the World Trade Center. During the summer of 2000, more than 100 requests for qualified bidders were sent to potential investors both domestically and internationally. Ex. C to the Barry Decl., Integra, Krauser & Cirz, Appraisal Report – Leasehold Interest: A Portion of the World Trade Center, at 7 (June 11, 2001). On June 21, 2000, offering materials were sent to thirty potential purchasers identified during a pre-qualification process conducted in late 1999. In the summer and fall of 2000, the Port Authority initiated a competitive bidding process for the long-term lease of the World Trade Center. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 161.

5.      The bidding process resulted in the selection by the Port Authority of four finalists as potential leaseholders: WTCP,[2] Vornado Realty Trust, Brookfield Properties

---

[2]    "WTCP" collectively refers to World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC.

and Boston Properties. Ex. D to the Barry Decl., Michael Levy Dep., at 87-88, *SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, No. 01-CV-9291 (S.D.N.Y. June 3, 2002).

6.    According to its website, "Vornado is one of the largest owners and managers of real estate in the United States with a portfolio of over 100 million square feet in its major platforms, primarily located in the New York and Washington, DC metro areas. The company's four major platforms include: New York City Office; Washington, DC Office; Retail Properties and Merchandise Mart." Ex. E to the Barry Decl., Vornado Realty Trust, About Vornado Realty Trust, http://www.vno.com/about/ (last visited June 2, 2008).

7.    According to its website, "Brookfield Properties is a commercial real estate corporation that owns, develops, and operates premier assets in the downtown cores of high-growth North American cities. Our signature properties define the skylines of many major metropolises including New York, Boston, Washington, D.C., Los Angeles, Houston, Toronto, and Calgary. Brookfield Properties is a publicly traded company, and is listed under the ticker symbol BPO on both the New York and Toronto Stock Exchanges." Ex. F to the Barry Decl., Brookfield Properties, Company Overview, http://www.brookfieldproperties.com/corporate/ (last visited June 2, 2008).

8.    According to its website, "Boston Properties, a self-administered and self-managed real estate investment trust, is one of the largest owners, managers, and developers of first-class office properties in the United States, with a significant presence in four core markets: Boston, Washington, D.C., Midtown Manhattan and San

Francisco." Ex. G to the Barry Decl., Boston Properties, About, Overview, http://www.bostonproperties.com/site/about/index.aspx (last visited June 2, 2008).

9.      Each of the finalists conducted a due diligence review of the property's value.  According to J.P. Morgan, the reviews involved "four months of full-scale diligence, including financial review of property operations; physical inspection of the property; and legal/business reviews of data room materials."  J.P. Morgan also reported that "[e]ach team spent at least one million dollars during this process."  Ex. B to the Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation, at 2.

10.     Vornado Realty Trust submitted the highest bid of $3.253 billion for WTC 1, 2, 4, and 5 and the Retail Mall.  *Id.* at 18.  In February 2001, the Port Authority entered into a 20-day exclusive negotiating period with Vornado Realty Trust.  Ex. A, Minutes of the Bd. of Comm'rs of the Port Auth. at 161.  However, the negotiations between Vornado Realty Trust and the Port Authority failed to result in an agreement regarding the net lease property.  *Id.* at 162.

11.     The Port Authority then entered into exclusive negotiations for the World Trade Center net leases with WTCP.  *Id.*

12.     On April 26, 2001, the Port Authority Board authorized the Port Authority to enter into the Agreement to Enter into Net Lease at $3.2 billion, which included the 99-year net leases with WTCP and $395 million for the Net Lease with Westfield LLC for the Retail Mall.  Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth. (Apr. 26, 2001).  WTCP executed the Agreement to Enter into Net Leases with the Port Authority on April 26, 2001.  Ex. H to the Barry Decl., Agreement to Enter into Net

4

Lease – 1 World Trade Ctr. (Apr. 26, 2001); Ex. I to the Barry Decl., Agreement to Enter into Net Lease – 2 World Trade Ctr. (Apr. 26, 2001); Ex. J to Barry Decl., Agreement to Enter into Net Lease – 4 World Trade Ctr. (Apr. 26, 2001); Ex. K to the Barry Decl., Agreement to Enter into Net Lease – 5 World Trade Ctr. (Apr. 26, 2001).

13.    On April 27, 2001, the Port Authority's consultant, J.P. Morgan, delivered a fairness opinion concluding that the consideration to be paid by WTCP for the World Trade Center was fair, from a financial point of view, to the Port Authority.  Ex. B to Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation (Apr. 27, 2001).

### The Net Lease Agreements

14.    On July 16, 2001, WTCP and the Port Authority entered into 99-year net leases for the World Trade Center complex.  Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease – 1 World Trade Ctr. (July 24, 2001); Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease – 2 World Trade Ctr. (July 24, 2001); Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease – 4 World Trade Ctr. (July 24, 2001); Ex. O to the Barry Decl., Agreement of Lease – 5 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease – 5 World Trade Ctr. (July 24, 2001).

15.    WTCP contemporaneously valued the transaction at $3.2 billion, with $2.8 billion allocated to WTC 1, 2, 4, and 5, and $395 million allocated to the Retail Mall.  Ex.

P to the Barry Decl., Silverstein Properties, Inc., World Trade Center Office Complex Brochure, at 1.

16.    WTCP and Westfield LLC made a one-time, up-front cash payment of $616 million, with $491 million paid by WTCP and $125 million paid by Westfield LLC. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 164; Ex. Q to the Barry Decl., GMAC Commercial Mortgage Securities, Inc., Confidential Offering Circular, at 92 (Aug. 8, 2001).

17.    The $3.2 billion value that WTCP contemporaneously assigned to the Westfield and WTCP Net Leases includes the up-front cash payment, a 99-year stream of base rents with a then present value of approximately $2.53 billion, and a 99-year stream of participating rents with a then present value of approximately $65 million. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 164-65. WTCP's 2001 audited financial statements valued WTC 1, 2, 4, and 5 as a capital asset worth $2.8 billion. Ex. W to the Barry Decl., World Trade Center Properties LLC and Subsidiaries Consolidated Financial Statements as of December 31, 2001, at 2-3 (Apr. 22, 2002); Ex. D to the Barry Decl., Transcript of Levy Deposition, at 445-46.

18.    Section 15.1 of each Agreement of Lease provides that:

"If the Premises (other than the Appurtenances) or any structures, improvements, fixtures and equipment, furnishings and physical property located thereon, or any part thereof, shall be damaged or destroyed by fire, the elements, the public enemy or other casualty, or by reason of any cause whatsoever and whether partial or total, the Lessee, at its sole cost and expense, and whether or not such damage or destruction is covered by insurance proceeds sufficient for the purpose, shall remove all debris resulting from such damage or destruction, and shall rebuild, restore, repair and replace the Premises (other than the Appurtenances) and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, to the extent

6

feasible, prudent and commercially reasonable, with the plans and specifications for the same as they existed prior to such damage or destruction or, with the consent in writing of the Port Authority, which consent shall not be unreasonably withheld, conditioned or delayed, make such other repairs, replacements, changes or alterations as is mutually agreed to by the Port Authority and the Lessee."

Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr., sec. 15.1; Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr., sec. 15.1; Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr., sec. 15.1; Ex. O to the Barry Decl., Agreement of Lease – 5 World Trade Ctr., sec. 15.1.

19.    Section 16.1 of each Agreement of Lease provides that 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC (the "Special Purpose Entities"):

"Notwithstanding anything contained in this Agreement to the contrary, the Lessee and its direct or indirect partners (general or limited), members, shareholders, directors, officers, agents and employees, and their respective successors and assigns, shall not be charged personally with any liability or held personally liable under any term or provision of this Agreement or because of its execution or attempted execution (including in connection with the execution of any certificate or instrument delivered to the Port Authority or Code Compliance Office by any such party) or because of any breach or attempted or alleged breach hereof[.]" Furthermore, "the Port Authority shall have no cause of action against [the Special Purpose Entity] to enforce the terms, covenants, conditions, warranties, and obligations of [the Special Purpose Entity] under this Agreement other than (i) an action against [the Special Purpose Entity] to remove [the Special Purpose Entity] from possession during the continuance of an Event of Default following the effectiveness of a Termination Notice in accordance with Section 21.1, or (ii) an action against [the Special Purpose Entity] to collect a judgment or other judicial process or arbitration award requiring payment of money by [the Special Purpose Entity] from any Gross Revenues, insurance proceeds, and condemnation awards thereafter payable to [the Special Purpose Entity] with respect to the Premises, and the Port Authority shall look solely to [the Special Purpose Entity's] estate and interest in the Premises (including, without limitation, any Gross Revenues, insurance proceeds, and condemnation awards thereafter payable to [the Special Purpose Entity] with respect to the Premises) and the Port Authority's sole remedy in the event of any such breach or default by

7

[the Special Purpose Entity] hereunder shall be to terminate [the Special Purpose Entity's] estate and interest in the Premises and, subject to the provisions of Section 21.1 below, to collect a judgment or other judicial process or arbitration award requiring payment of money by [the Special Purpose Entity] from any Gross Revenues, insurance proceeds, and condemnation awards thereafter payable to [the Special Purpose Entity] with respect to the Premises, subject nevertheless to the rights of a Mortgagee to cure such breach or default in accordance with the applicable provisions of this Agreement."

Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr., sec. 16.1; Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr., sec. 16.1; Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr., sec. 16.1; Ex. O to the Barry Decl., Agreement of Lease – 5 World Trade Ctr., sec. 16.1.

## WTCP's Expected Insurance Recovery

20.    The World Trade Center net leases required WTCP to insure the property against loss, including destruction by terrorists. Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr., sec. 14.1.1; Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr., sec. 14.1.1; Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr., sec. 14.1.1; Ex. O to the Barry Decl., Agreement of Lease – 5 World Trade Ctr., sec. 14.1.1.

21.    WTCP fulfilled this obligation by obtaining even more insurance than the $1.5 billion per occurrence required by the net leases and previously maintained by the Port Authority. As of September 11, 2001, WTCP had insured the World Trade Center for $3.5468 billion per occurrence. Ex. R to the Barry Decl., *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 158 (2d Cir. 2003). The amount was set by WTCP's lender, GMAC. It was intended to cover the replacement property value of the

World Trade Center plus "several years of rental income." Ex. S to the Barry Decl., *SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, No. 01-CV-9291, Trial Tr., at 1368-69, (S.D.N.Y. Oct. 27, 2004) (trial testimony of Silverstein Properties Risk Manager Robert Strachan).

22.    After September 11, 2001, WTCP and its insurers disputed whether the terrorist attack was one or two occurrences.  A series of jury verdicts and appeals on this issue resulted in rulings that WTCP was insured for $4.6 billion.  Ex. X to the Barry Decl., *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.*, 467 F.3d 107, 114-18, 140 (2d Cir. 2006).

23.    WTCP has already received, or based upon existing agreements with its insurers, will receive, a total of no less than $4,091,364,039 of the $4,581,794,675 in insurance payments made and to be made by their insurers.  A portion of the insurance payments was allocated to the retail portion of the WTC complex based on a formula. No more than $490,430,635 was allocated to the retail portion of the Complex.  Ex. T to the Barry Decl., Wachtell, Lipton, Rosen & Katz, WTCP Main Site Plaintiffs – Property Insurance Payments Received and to be Received, by Insurance Carrier.

24.    The value of insurance payments received or projected to be received by WTCP, discounted to September 11, 2001, at the rate earned by short-term Treasury instruments (compounded annually) is $3.5 billion.  Declaration of Rajiv Gokhale ("the Gokhale Decl."), at ¶ 3.  The value of insurance payments received or projected to be received by WTCP, discounted to September 11, 2001, at a simple interest rate of 6% annually, is $3.2 billion.  *Id.* at ¶ 4.  The value of insurance payments received or

projected to be received by WTCP, discounted to September 11, 2001, at a simple interest rate of 6% annually, is $3 billion. *Id.* at ¶ 5.

25.    At the rate earned by short-term Treasury instruments (compounded annually), with interest running to the date that each insurance payment has been or is projected to be received, WTCP's $2.8 billion loss accrues to $3.04 billion. *Id.* at ¶ 8. At a simple interest rate of 6% annually, with interest running to the date that each insurance payment has been or is projected to be received, WTCP's $2.8 billion claim accrues to $3.2 billion. *Id.* at ¶ 9. At a simple interest rate of 9% annually, with interest running to the date that each insurance payment has been or is projected to be received, WTCP's $2.8 billion claim accrues to $3.4 billion. *Id.* at ¶ 10.

**WTCP's Damages Claims**

26.    WTCP's claim for total damages for WTC 1, 2, 4, and 5 is approximately $12.3 billion plus prejudgment interest. Ex. U to the Barry Decl., Transcript of March 18, 2008 Hearing, at 43; Ex. V to the Barry Decl., WTCP Cross-Claim Plaintiffs' Updated Damage Disclosure: 1, 2, 4, and 5 World Trade Center (Apr. 23, 2007).

27.    WTCP claims replacement costs of $8.4 billion. Ex. V to the Barry Decl., WTCP Cross-Claim Plaintiffs' Updated Damage Disclosure: 1, 2, 4, and 5 World Trade Center (Apr. 23, 2007).

28.    WTCP claims damages of $3.9 billion for lost profits. *Id.*

Dated:  June 20, 2008
        New York, New York

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
    Desmond T. Barry, Jr. (DB 8066)
    7 Times Square
    New York, NY 10036
    Telephone:  (212) 490-9100
    Facsimile:  (212) 370-4453
    dbarry@condonlaw.com

    Aviation Defendants' Liaison Counsel

11