Richard A. Williamson, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
rwilliamson@fzwz.com

Attorneys for Plaintiffs
World Trade Center Properties LLC
1 World Trade Center LLC
2 World Trade Center LLC
3 World Trade Center LLC
4 World Trade Center LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
                                                              :    21 MC 101 (AKH)
                                                              :
IN RE SEPTEMBER 11 PROPERTY DAMAGE          :    This document also relates to:
AND BUSINESS LOSS LITIGATION                       :
                                                              :    08 CIV 3719
                                                              :    08 CIV 3722
------------------------------------------------------------- X

**WTCP'S PLAINTIFFS' COUNTER-STATEMENT OF MATERIAL FACTS
IN DISPUTE IN OPPOSITION TO THE AVIATION DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT BASED ON CPLR 4545(c)**

Plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC and 4 World Trade Center LLC (collectively, "WTCP") submit this counter-statement of material facts pursuant to Local Civil Rule 56.1(b) in response to the Aviation Defendants' Statement Pursuant to Local Rule 56.1 (the "Movants' Statement").

WTCP's response to the statements in the 28 paragraphs of the Movants' Statement is set forth in paragraphs 1-28 below.

WTCP's statements of material facts as to which there exists a genuine issue to be tried are set forth in paragraphs 29-108 below.

307303

**WTCP Need Not Controvert the Statements in the Movants'
Statement That Are Not Supported by Admissible Evidence**

The Movants' Statement is required to cite to admissible evidence in support of its

factual assertions. *See* Local Civil Rule 56.1(d) ("Each statement [in a Rule 56.1 statement]  . . .

must be followed by citation to evidence which would be admissible."); *FTC v. Medical Billers*

*Network, Inc.*, 543 F. Supp. 2d 283, 301 (S.D.N.Y. 2008) ("Assertions in Rule 56.1 Statements and

Rule 56.1 Responses must be followed by citation to admissible evidence, in accordance with Fed.

R. Civ. P. 56(e).").

The Movants' Statement cites to 11 materials that are inadmissible as evidence.

Each of the eleven inadmissible materials cited by the Movants' Statement is identified in WTCP's

accompanying cross-motion to strike.[1]  Fifteen of the 28 Paragraphs of the Movants' Statement —

Paragraphs 2, 4, 6-10, 13, 16, and 21-26 — cite to the eleven inadmissible materials.

The Movants' Statement makes factual assertions that are not supported by the

admissible evidence to which it cites.  Twenty four of the 28 Paragraphs of the Movants'

Statement — Paragraphs 1-10, 12-13, 15-17, and 20-28 — are, in whole or in part, not supported

by admissible evidence.

All told, 46 of the 51 sentences in the Movants' Statement are, in whole or in part,

not supported by admissible evidence.

Assertions in a Rule 56.1 statement that are not supported by citations to admissible

evidence should be disregarded. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)

("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those

assertions should be disregarded."); *FTC v. Medical Billers Network, Inc.,* 543 F. Supp. 2d at 302

("[A]llegations are not 'deemed true simply by virtue of their assertion in [the] Local Rule 56.1

statement.'  If the FTC's allegations are not accompanied by citations to admissible evidence or if

the cited evidence does not support the allegation, the Court is free to disregard them.") (citation

---

[1]     *See* Memorandum of Law in Support of Cross-Motion to Strike Inadmissible Materials from the
Aviation Defendants' Motion for Summary Judgment Motion, based on CPLR 4545(c) ("Cross Motion to
Strike Br.").

omitted); *Watt v. New York Botanical Garden*, 98 Civ. 1095, 2000 WL 193626, at *1 (S.D.N.Y. Feb. 16, 2000) ("where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion").

Since unsupported assertions in the Movants' Statement should be disregarded, WTCP is not obligated to controvert those unsupported assertions with citations to evidence. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("The record does not support certain critical assertions in defendant's Rule 56.1 statement on which the district court relied, with the result that, even though plaintiff's Rule 56.1 counter-statement failed to specifically controvert these assertions, the unsupported assertions must nonetheless be disregarded."); *Mitchell v. Dept. of Corrections*, 05 Civ. 5792, 2008 WL 744041, at *1 n.3 (S.D.N.Y. Feb. 20, 2008) (plaintiff is "not required to rebut an insufficient showing" in a Rule 56.1 statement) (citations omitted); *NAACP Legal Defense & Educ. Fund v. U.S. Dept. of Housing & Urban Dev.*, 07 Civ. 3378, 2007 WL 4233008, at *1 n.1 (S.D.N.Y. Nov. 30, 2007) ("[P]laintiff must adduce admissible evidence in the record to support the factual assertions contained in the Rule 56.1 Statement, as defendant 'is not required to rebut an insufficient showing.'") (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003)).

## WTCP'S RESPONSE TO EACH OF THE MOVANTS' STATEMENT'S TWENTY-EIGHT PARAGRAPHS

### Movants' Statement Paragraph No. 1:

In 1996, the Port Authority of New York and New Jersey (the "Port Authority") began a process to privatize the World Trade Center complex. Ex. A to the Declaration of Desmond T. Barry, Jr. dated June 20, 2008 ("the Barry Decl."), Minutes of the Bd. Of Comm'rs of the Port Auth., at 161 (Apr. 26, 2001).

### WTCP's Response to Paragraph No. 1:

WTCP disputes Paragraph No. 1.

To the extent Paragraph No. 1 characterizes the Port Authority's actions as beginning a process to "privatize" the World Trade Center, this paragraph is unsupported by the evidence. Declaration of Desmond T. Barry, Jr., executed June 20, 2008, in support of

Defendants' motion ("Barry Decl.") Exh. A (Minutes of the Bd. of Comm'rs of the Port Auth. Dated April 26, 2001 ("April 26, 2001 Port Minutes")) at 161. Paragraph No. 1's "privatize" assertion is further controverted by the terms of the net leases entered into between the Port Authority and WTCP (the "Net Leases") for space within the One, Two, Four and Five World Trade Center buildings (the "Premises") which expressly provide and demonstrate that the Port Authority retained both ownership and control of the Premises. Barry Decl. Exhs. L, M, N and O (Net Leases) at Recital, p. 3 and §§ 2.1, 2.5, 6.2.5, 6.2.12, 6.3, 6.3.4, 6.4.2, 6.4.6, 7.1, 7.1.2, 7.12, 8.3, 9.2, 10.1, 12.2, 14.8 and 15.1. Paragraph No. 1's "privatize" assertion is further controverted by the Net Leases insofar as they expressly address the rights of WTCP and the Port Authority if, during the term of the Net Leases, there occurs an event of "privatization"; *i.e.*, the Port Authority sells, assigns, or otherwise disposes of its interest in the Premises. Barry Decl. Exhs. L, M, N and O (Net Leases) §§ 60, 61.[2]

Further, the facts alleged by Paragraph No. 1 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 2:**

To assist in this process, the Port Authority retained investment banking firm J.P. Morgan and property consulting firms Cushman & Wakefield and Milstein Realty Advisors. Ex. B to the Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation, at 2 (Apr. 27, 2001).

**WTCP's Response to Paragraph No. 2:**

WTCP disputes Paragraph No. 2.

---

[2]      Paragraph No. 1 is also inaccurate and contradicts the cited evidence insofar as it alleges the wrong year. The cited evidence demonstrates that it was not until 1998 that the Port Authority "decided to begin the process intended to lead to the net leasing of certain components of the World Trade Center." Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161. The cited evidence also shows that it was not until 2000 that the Port Authority actually began that "process" by distributing "offering materials pertaining to the opportunity to net lease the WTC." *Id.*

The statement in Paragraph No. 2 is not supported by admissible evidence because it is based upon inadmissible third party hearsay: the World Trade Center Net Lease Transaction Fairness Opinion Presentation (the "Opinion Presentation").[3]

Furthermore, Paragraph No. 2 is inaccurate and contradicts the cited inadmissible Opinion Presentation insofar as its use of the phrase "this process" refers to the supposed "process to privatize the World Trade Center complex" used without foundation in Paragraph No. 1 as shown above. WTCP incorporates, as if fully set forth herein, the evidence cited in its Response to Paragraph No. 1. The cited inadmissible Opinion Presentation nowhere supplies explicit or implicit support for the assertion that there was a "process to privatize the World Trade Center complex." To the contrary, the cited inadmissible Opinion Presentation merely refers to the net lease for the Premises, which does not involve the transfer of both ownership and control. *See* Barry Decl. Exh. B (Opinion Presentation), at p. 2.

Further, the facts alleged by Paragraph No. 2 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 3:**

The Port Authority's objective was to obtain the maximum value from the transaction for the Port Authority. Working with its consultants, the Port Authority decided to structure the transaction as a long-term net lease. Ex. A to the Barry Decl., Minutes of the Bd. Of Comm'rs of the Port Auth., at 161.

**WTCP's Response to Paragraph No. 3:**

WTCP disputes Paragraph No. 3.

The first sentence in Paragraph No. 3 is inaccurate and contradicts the evidence cited by the first sentence in two respects.

First, the first sentence's use of the phrase "the transaction" implies a definitive, particular transaction. The cited evidence's single reference to the Port Authority's objective is not

---

[3]    The Opinion Presentation is inadmissible as evidence because it is hearsay, is based on hearsay, and itself concedes it is "incomplete" and may not be accurate. *See* Cross Motion to Strike Br. at 2-3, 15.

made in the context of a definitive, particular transaction. Instead, the cited evidence refers to three options considered by the Port Authority over five years before the Net Leases were entered into. Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161 ("On January 25, 1996, the Port Authority announced a series of steps to test the marketplace response to *three specific options* for maximizing the value of the World Trade Center to the Port Authority *and to the people of the region*, involving the sale, net lease and asset management of the World Trade Center.") (emphasis added). The cited evidence nowhere states that the Port Authority's sole objective in the "transaction" over five years later with WTCP was "to obtain the maximum value" to the Port Authority alone.

Second, the first sentence's use of the phrase "the transaction" improperly suggests that obtaining "maximum value from the transaction" was the sole objective of the Port Authority, to the exclusion of any other objective. In entering into the Net Leases, the Port Authority had numerous objectives other than obtaining maximum value. As noted above, the Port Authority also was interested in maximizing the value of the World Trade Center both to the Port Authority and *to the people of the region* when it began to explore options over five years before the Net Leases were entered into. The Port Authority's other objectives are evidenced by the Port Authority's requirement that it continue to "own, control and operate the World Trade Center pursuant to the World Trade Center Legislation." Barry Decl. Exhs. L, M, N and O (Net Leases) at Recital, p. 3.

The assertion that the "Port Authority's objective was to obtain the maximum value from the transaction" is refuted by other evidence cited by the Movants' Statement. Barry Decl. Exh. P (World Trade Center Office Complex brochure (the "Brochure")) at 5 ("As a governmental agency, the PA often makes decisions that are based on political considerations.").

The second sentence of Paragraph No. 3 — which asserts that the Port Authority was "[w]orking with its consultants" when it "decided to structure the transaction as a long-term net lease" — is inaccurate and is not supported by the evidence cited, which actually provides:

"On September 24, 1998, the Board decided to begin the process intended to lead to the net leasing of certain components of the World Trade Center." Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161. The cited evidence does not reference the involvement of any consultant. More importantly, however, the evidence cited by the Movants' Statement merely states that the Port Authority decided it wanted to achieve the "net leasing of *certain components* of the World Trade Center." Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161 (emphasis added). This evidence does not describe the process of "net leasing" as a transaction, much less as a single transaction: in fact there were four separate net leases with WTCP. Barry Decl. Exhs. L, M, N and O (Net Leases). Finally, the cited evidence nowhere makes reference to a Port Authority decision to "structure the transaction."

Further, the facts alleged by Paragraph No. 3 are not material to the issues raised by this motion.

### Movants' Statement Paragraph No. 4:

The Port Authority broadcast a worldwide request for interest in bidding on the World Trade Center. During the summer of 2000, more than 100 requests for qualified bidders were sent to potential investors both domestically and internationally. Ex. C to the Barry Decl., Integra, Krauser & Cirz, Appraisal Report - Leasehold Interest: A Portion of the World Trade Center, at 7 (June 11, 2001). On June 21, 2000, offering materials were sent to thirty potential purchasers identified during a pre-qualification process conducted in late 1999. In the summer and fall of 2000, the Port Authority initiated a competitive bidding process for the long-term lease of the World Trade Center. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 161.

### WTCP's Response to Paragraph No. 4:

WTCP disputes Paragraph No. 4.

The first two sentences of Paragraph No. 4 cite to and rely upon an inadmissible hearsay document — Integra, Krauser & Cirz, Appraisal Report - Leasehold Interest: A Portion of the World Trade Center (the "Appraisal")[4] — and, therefore, do not require a response.

---

[4]    The Appraisal is inadmissible as evidence because it is hearsay, is based on hearsay, and itself concedes its statements may not be accurate and constitute opinion. *See* Cross Motion to Strike Br. at 4, 15.

The first sentence of Paragraph No. 4 is inaccurate and unsupported by the inadmissible Appraisal in three respects.

First, the first sentence's use of the word "broadcast" is unsupported by the inadmissible Appraisal. "Broadcast" means "to make widely known: distribute or disseminate widely or at random." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 280 (1971). The inadmissible Appraisal nowhere uses the word "broadcast." What the inadmissible Appraisal actually says is:

> After recommendations, the Port Authority decided to offer a leasehold interest which would be subject to a 99-year master lease. During the summer of 2000, more than 100 requests for qualified bidders were sent to potential investors, both domestically and internationally.

Barry Decl. Exh. C (Appraisal) at 7. Accordingly, the characterization is inaccurate.

Second, the first sentence's use of the phrase "bidding on the World Trade Center" erroneously implies that the Port Authority was seeking to sell the World Trade Center complex. This implication is contradicted by the inadmissible Appraisal itself, which shows that the transaction sought by the Port Authority was the "offer [of] a leasehold interest" and not the sale of the World Trade Center at all. Barry Decl. Exh. C (Appraisal) at 7.

Third, the first sentence's use of the word "worldwide" is unsupported by the inadmissible Appraisal. "Worldwide" means "extended or extending throughout the entire world." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2635. The inadmissible Appraisal nowhere uses the word "worldwide." What the inadmissible Appraisal actually says is that requests "were sent to potential investors, both domestically and internationally." Barry Decl. Exh. C (Appraisal) at 7. Accordingly, the characterization is inaccurate.

The third sentence of Paragraph No. 4 — "On June 21, 2000, offering materials were sent to thirty potential purchasers identified during a pre-qualification process conducted in late 1999" — is inaccurate and contradicts the evidence cited insofar as it uses the term "purchasers." What the cited evidence actually says is:

> On June 21, 2000, certain offering materials pertaining to the opportunity to net lease the WTC were sent to 30 entities identified as a result of a pre-qualification process conducted in late 1999.

Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161.  What the third sentence does is rewrite the cited evidence by replacing the word "entities" with the word "purchasers."  To the extent this sentence by its mischaracterizations transforms the Net Leases transaction into a "sale" of the World Trade Center complex, it is both inaccurate and misleading.  The term "purchasers" is also contradicted by the inadmissible Opinion Presentation, cited elsewhere by the Movants' Statement, which uses the term "participants" to describe to whom the offering materials were sent.  Barry Decl. Exh. B (Opinion Presentation) at 3.

The fourth sentence of Paragraph No. 4 — "In the summer and fall of 2000, the Port Authority initiated a competitive bidding process for the long-term lease of the World Trade Center" — is inaccurate and contradicts the cited evidence insofar as it uses the conclusory phrase "competitive bidding process."  What the cited evidence actually says about what the Port Authority did in the summer and fall of 2000 is:

> On June 21, 2000, certain offering materials pertaining to the opportunity to net lease the WTC were sent to 30 entities identified as a result of a pre-qualification process conducted in late 1999.
>
> Eight initial proposals were received on August 30, 2000, and after review by Port Authority staff and the Advisors and discussion of the proposals with the Board, in mid-October 2000, a "short list" of four proposers . . . was selected to participate in the next phase of the net lease process.

Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161.  The contrary inference, that the process was not "competitive," can also be drawn from the cited evidence, given that only eight proposals were received by the Port Authority, and of those eight, only four proposals were adequate enough to allow the "proposers" to participate in the next phase. *Id.*

Further, the facts alleged by Paragraph No. 4 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 5:**

   The bidding process resulted in the selection by the Port Authority of four finalists as potential leaseholders:  WTCP, Vornado Realty Trust, Brookfield Properties and Boston Properties. Ex. D to the Barry Decl., Michael Levy Dep., at 87-88, *SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC,* No. 01-CV-9291 (S.D.N.Y. June 3, 2002).

**WTCP's Response to Paragraph No. 5:**

   WTCP disputes Paragraph No. 5.

   Paragraph No. 5 is not supported by the evidence cited by the Movants' Statement insofar as such evidence merely provides that the Port Authority selected finalists and identified such finalists.  The evidence lends no direct support to Paragraph No. 5's claims that "[t]he bidding process resulted in" the Port Authority's selection of four finalists.  Paragraph No. 5 is also inaccurate in that although there were four companies that participated in submitting bids, there were only three bids because two of the companies only submitted bids as part of a joint venture. Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161.

   Further, the facts alleged by Paragraph No. 5 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 6:**

   According to its website, "Vornado is one of the largest owners and managers of real estate in the United States with a portfolio of over 100 million square feet in its major platforms, primarily located in the New York and Washington, DC metro areas.  The company's four major platforms include:  New York City Office; Washington, DC Office; Retail Properties and Merchandise Mart."  Ex. E to the Barry Decl., Vornado Realty Trust, About Vornado Realty Trust, http://www.vno.com/about/ (last visited June 2, 2008).

**WTCP's Response to Paragraph No. 6:**

   WTCP disputes Paragraph No. 6.

   Paragraph No. 6 cites to and relies upon inadmissible hearsay — Vornado Realty Trust's ("Vornado") description of itself on its web site in June, 2008 (the "Vornado Print-Out") — and, therefore, does not require a response.[5]

---

[5]  The Vornado Print-Out is inadmissible as evidence because it is hearsay and lacks circumstantial guarantees of trustworthiness. *See* Cross Motion to Strike Br. at 6, 16-17.

Also, the inadmissible Vornado Print-Out has no temporal relevance. Other paragraphs of the Movants' Statement refer to Vornado during 2000 and 2001 (Movants' Stmt. ¶¶ 5, 9, 10) and not as of June, 2008, the date on which the inadmissible Vornado Print-Out purports to describe Vornado.

Further, the facts alleged by Paragraph No. 6 are not material to the issues raised by this motion.

### Movants' Statement Paragraph No. 7:

According to its website, "Brookfield Properties is a commercial real estate corporation that owns, develops, and operates premier assets in the downtown cores of high-growth North American cities. Our signature properties define the skylines of many major metropolises including New York, Boston, Washington, D.C., Los Angeles, Houston, Toronto, and Calgary. Brookfield Properties is a publicly traded company, and is listed under the ticker symbol BPO on both the New York and Toronto Stock Exchanges." Ex. F to the Barry Decl., Brookfield Properties, Company Overview, http://www.brookfieldproperties.com/corporate/ (last visited June 2, 2008).

### WTCP's Response to Paragraph No. 7:

WTCP disputes Paragraph No. 7.

Paragraph No. 7 cites to and relies upon inadmissible hearsay — Brookfield Properties' ("Brookfield") description of itself on its web site in June, 2008, (the "Brookfield Print-Out") — and, therefore, does not require a response.[6]

Also, the inadmissible Brookfield Print-Out has no temporal relevance. Other paragraphs of the Movants' Statement refer to Brookfield during 2000 and 2001 (Movants' Stmt. ¶¶ 5, 9), and not as of June, 2008, the date on which the inadmissible Brookfield Print-Out purports to describe Brookfield.

Further, the facts alleged by Paragraph No. 7 are not material to the issues raised by this motion.

---

[6]    The Brookfield Print-Out is inadmissible as evidence because it is hearsay and lacks circumstantial guarantees of trustworthiness. *See* Cross Motion to Strike Br. at 6-7, 16-17.

**Movants' Statement Paragraph No. 8:**

According to its website, "Boston Properties, a self-administered and self-managed real estate investment trust, is one of the largest owners, managers, and developers of first-class office properties in the United States, with a significant presence in four core markets: Boston, Washington, D.C., Midtown Manhattan and San Francisco." Ex. G to the Barry Decl., Boston Properties, About, Overview, http://www.bostonproperties.com/site/about/index.aspx (last visited June 2, 2008).

**WTCP's Response to Paragraph No. 8:**

WTCP disputes Paragraph No. 8.

Paragraph No. 8 cites to and relies upon inadmissible hearsay — Boston Properties' ("Boston") description of itself on its web site in June, 2008 (the "Boston Print-Out") — and, therefore, does not require a response.[7]

Also, the inadmissible Boston Print-Out has no temporal relevance. Other paragraphs of the Movants' Statement refer to Boston during 2000 and 2001 (Movants' Stmt. ¶¶ 5, 9), and not as of June, 2008, the date on which the inadmissible Boston Print-Out purports to describe Boston.

Further, the facts alleged by Paragraph No. 8 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 9:**

Each of the finalists conducted a due diligence review of the property's value. According to J.P. Morgan, the reviews involved "four months of full-scale diligence, including financial review of property operations; physical inspection of the property; and legal/business reviews of data room materials." J.P. Morgan also reported that "[e]ach team spent at least one million dollars during this process." Ex. B to the Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation, at 2.

**WTCP's Response to Paragraph No. 9:**

WTCP disputes Paragraph No. 9.

Paragraph No. 9 cites to and relies upon the inadmissible Opinion Presentation and, therefore, does not require a response. *See* WTCP's Response to Paragraph No. 2.

---

[7]    The Boston Print-Out is inadmissible as evidence because it is hearsay and lacks circumstantial guarantees of trustworthiness. *See* Cross Motion to Strike Br. at 7, 16-17.

Moreover, the portion of the Opinion Presentation cited by Paragraph No. 9 is triple hearsay as the author is purporting to report on what the Port Authority said, and what the Port Authority said is based on what other persons purportedly told the Port Authority.

Nevertheless, the first sentence of Paragraph No. 9 is inaccurate and contradicts the inadmissible Opinion Presentation. The inadmissible Opinion Presentation nowhere supports the assertion that the subject of the due diligence review was "the property's value." What the inadmissible Opinion Presentation actually says is that the finalists "conducted four months of full-scale due diligence, including financial review of property operations; physical inspection of the property; and, legal/business review of data room materials." Barry Decl. Exh. B (Opinion Presentation) at 2.

Further, the facts alleged by Paragraph No. 9 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 10:**

Vornado Realty Trust submitted the highest bid of $3.253 billion for WTC 1, 2, 4, and 5 and the Retail Mall. *Id.* at 18. In February 2001, the Port Authority entered into a 20-day exclusive negotiating period with Vornado Realty Trust. Ex. A, Minutes of the Bd. of Comm'rs of the Port Auth. at 161. However, the negotiations between Vornado Realty Trust and the Port Authority failed to result in an agreement regarding the net lease property. *Id.* at 162.

**WTCP's Response to Paragraph No. 10:**

WTCP disputes Paragraph No. 10.

The first sentence of Paragraph No. 10 cites to and relies upon the inadmissible Opinion Presentation and, therefore, does not require a response. *See* WTCP's Response to Paragraph No. 2. Moreover, the portion of the Opinion Presentation cited by Paragraph No. 10 is triple hearsay as the author is purporting to report on what the Port Authority purportedly said, and what the Port Authority purportedly said is based on what Vornado purportedly told the Port Authority.

Nevertheless, Paragraph No. 10 is inaccurate and contradicts the inadmissible Opinion Presentation in several respects.

13

First, the first sentence's use of the phrase "highest bid" is not supported in the inadmissible Opinion Presentation. The inadmissible Opinion Presentation simply notes a present value calculation of Vornado's "proposal." Barry Decl. Exh. B (Opinion Presentation) at 18 n.3. The inadmissible Opinion Presentation nowhere states that Vornado's "proposal" was a "bid" or that Vornado's "proposal" was the "highest" proposal.

Second, the first sentence's assertion that Vornado's proposal was for $3.253 billion is inaccurate and is contradicted by the inadmissible Opinion Presentation. What the inadmissible Opinion Presentation actually says is that the "present value" of Vornado's "proposal" was $3.253 billion. *Id.* at 18.

Third, the first sentence's assertion regarding the amount of Vornado's proposal is not supported by the inadmissible Opinion Presentation since that document fails to indicate whether its own assertion of the present value of Vornado's proposal includes the entire package of rights and benefits conferred upon the Port Authority. Barry Decl. Exh. B (Opinion Presentation) at 18. Nor does that inadmissible document indicate how the "present value" calculations were performed or what discount rates were selected. *Id.*

The second sentence of Paragraph No. 10 — which asserts that "[t]he Port Authority entered into a 20-day exclusive negotiating period with Vornado Realty Trust" — is inaccurate to the extent it asserts such 20-day exclusive negotiating period was actually entered into. Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161.

The third sentence of Paragraph No. 10 — which asserts "the negotiations between Vornado Realty Trust and the Port Authority failed to result in an agreement regarding the net lease property" — is inaccurate and misleading insofar as the third sentence adds the word "property".

Further, the facts alleged by Paragraph No. 10 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 11:**

   The Port Authority then entered into exclusive negotiations for the World Trade Center net leases with WTCP. *Id.*

**WTCP's Response to Paragraph No. 11:**

   WTCP does not dispute Paragraph No. 11.

**Movants' Statement Paragraph No. 12:**

   On April 26, 2001, the Port Authority Board authorized the Port Authority to enter into the Agreement to Enter into Net Lease at $3.2 billion, which included the 99-year net leases with WTCP and $395 million for the Net Lease with Westfield LLC for the Retail Mall. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth. (Apr. 26, 2001). WTCP executed the Agreement to Enter into Net Leases with the Port Authority on April 26, 2001. Ex. H to the Barry Decl., Agreement to Enter into Net Lease - 1 World Trade Ctr. (Apr. 26, 2001); Ex. I to the Barry Decl., Agreement to Enter into Net Lease - 2 World Trade Ctr. (Apr. 26, 2001); Ex. J to Barry Decl., Agreement to Enter into Net Lease - 4 World Trade Ctr. (Apr. 26, 2001); Ex. K to the Barry Decl., Agreement to Enter into Net Lease - 5 World Trade Ctr. (Apr. 26, 2001).

**WTCP's Response to Paragraph No. 12:**

   WTCP disputes Paragraph No. 12

   The first sentence of Paragraph No. 12 is inaccurate and contradicts the cited

evidence. The cited evidence nowhere provides that the Port Authority Board ascribed a dollar

amount to the net leases when it authorized the Port Authority to enter into the Agreement to Enter

Into Net Lease. Instead, what the cited Port Authority Board's authorization actually provides is:

    RESOLVED, that the Executive Director and his designated
    representatives be and they each hereby are authorized, for and on behalf of
    the Port Authority, to take any and all action to effectuate the net lease of
    certain components of the World Trade Center, consistent with the terms
    and conditions outlined to the Board, including the execution of contracts,
    agreements and other documents . . .

Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 176.

   In fact, the cited evidence nowhere ascribes a dollar amount to the Agreement to

Enter Into Net Lease. The cited evidence actually describes those agreements as follows:

    The Port Authority would enter into five separate "Agreements to Enter Into
    Net Leases" ("Contracts"), pursuant to which . . . Silverstein would agree to
    net lease One, Two, Four and Five World Trade Center and . . . Westfield
    would agree to net lease the Mall . . . from the Port Authority.

Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 166.

While the cited evidence elsewhere ascribes a $3.211 billion amount — not to the

Agreement to Enter Into Net Lease, but rather to WTCP's final proposal — that amount includes

only the initial payment and the net present value of the projected fixed rental payments, the

projected participating rental payments, and projected additional base rental payments based on a

chosen discount rate. Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 164-65. The $3.211

billion amount is not the "value" to the Port Authority of WTCP's final proposal because it does

not include the entire bundle of rights and benefits conferred upon the Port Authority. *See, inter

alia*, Barry Decl. Exhs. L, M, N and O (Net Leases) §§ 1.220 2.5, 6.4, 6.7-6.11, 7.1, 13.1, 14, 15.1,

15.1.4, 17, 27.1. Nor does the cited evidence describe how the referenced discount rates were

selected or why they are appropriate. Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 164-65.

Further, the facts alleged by Paragraph No. 12 are not material to the issues raised by

this motion.

### Movants' Statement Paragraph No. 13:

On April 27, 2001, the Port Authority's consultant, J.P. Morgan, delivered a
fairness opinion concluding that the consideration to be paid by WTCP for the World Trade Center
was fair, from a financial point of view, to the Port Authority. Ex. B to Barry Decl., World Trade
Ctr. Net Lease Transaction Fairness Opinion Presentation (Apr. 27, 2001).

### WTCP's Response to Paragraph No. 13:

WTCP disputes Paragraph No. 13.

Paragraph No. 13 cites to and relies upon the inadmissible Opinion Presentation

and, therefore, does not require a response. *See* WTCP's Response to Paragraph No. 2.

Nevertheless, Paragraph No. 13 is inaccurate, to the extent it characterizes the inadmissible

Opinion Presentation as stating the consideration was to be paid by WTCP for the "World Trade

Center."

Further, the facts alleged by Paragraph No. 13 are not material to the issues raised by

this motion.

**Movants' Statement Paragraph No. 14:**

On July 16, 2001, WTCP and the Port Authority entered into 99-year net leases for the World Trade Center complex. Ex. L to the Barry Decl., Agreement of Lease - 1 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease - 1 World Trade Ctr. (July 24, 2001); Ex. M to the Barry Decl., Agreement of Lease - 2 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease - 2 World Trade Ctr. (July 24, 2001); Ex. N to the Barry Decl., Agreement of Lease - 4 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease - 4 World Trade Ctr. (July 24, 2001); Ex. O to the Barry Decl., Agreement of Lease - 5 World Trade Ctr. (July 16, 2001), *amended by* First Amendment to Agreement of Lease - 5 World Trade Ctr. (July 24, 2001).

**WTCP's Response to Paragraph No. 14:**

WTCP does not dispute Paragraph No. 14.

**Movants' Statement Paragraph No. 15:**

WTCP contemporaneously valued the transaction at $3.2 billion, with $2.8 billion allocated to WTC 1, 2, 4, and 5, and $395 million allocated to the Retail Mall. Ex. P to the Barry Decl., Silverstein Properties, Inc., World Trade Center Office Complex Brochure, at 1.

**WTCP's Response to Paragraph No. 15:**

WTCP disputes Paragraph No. 15

Paragraph No. 15 is inaccurate and not supported by the cited evidence. The cited Brochure nowhere provides that WTCP fixed the value of the Net Leases *to WTCP* at $3.2 billion. *See* Barry Decl. Exh. P (Brochure) at 1. Instead, the Brochure merely states that the value *to the Port Authority* of the initial payment and the net present value of some of the projected payments to the Port Authority under the Net Leases was $3.239 billion (using a chosen discount rate). Barry Decl. Exh. P (Brochure) at 1. This $3.239 billion amount is not the "value" of the Net Leases to the Port Authority, because it does not include the entire bundle of rights and benefits conferred upon the Port Authority. *See* Response to Paragraph 12. In addition, this inaccurate dollar amount "value" to the Port Authority of the Net Leases is not equivalent to the value of the Net Leases to WTCP, as reflected by the fact that the Brochure cited by Paragraph No. 15 provides that WTCP anticipated earning substantial cash flows and rates of return after making the projected payments to the Port Authority under the Net Leases. Barry Decl. Exh. P (Brochure) at 2 ("The investment is projected to produce a cash-on-cash return to the investor averaging 13% in

the first 10 years and an IRR in excess of 20%. Annual net tax losses for the first 10 years are

anticipated to equal approximately 40% of the investment.").

The Brochure explains why WTCP anticipated earning billions of dollars above and

beyond WTCP's projected payments to the Port Authority under the Net Leases:

> Since its development, the World Trade Center complex has operated under
> the management and leasing control of the Port Authority of New York and
> New Jersey. As a governmental agency, the PA often makes decisions that
> are based on political considerations. The net lease of the World Trade
> Center by a professional, private entrepreneur with almost 50 years of
> experience, driven by profit considerations, creates the opportunity for
> improved operational efficiencies and revenue enhancement.

Barry Decl. Exh. P (Brochure) at 5.

Further, the facts alleged by Paragraph No. 15 are not material to the issues raised by

this motion.

**Movants' Statement Paragraph No. 16:**

WTCP and Westfield LLC made a one-time, up-front cash payment of $616
million, with $491 million paid by WTCP and $125 million paid by Westfield LLC. Ex. A to the
Barry Decl., Minutes of the Bd. Of Comm'rs of the Port Auth., at 164; Ex. Q to the Barry Decl.,
GMAC Commercial Mortgage Securities, Inc., Confidential Offering Circular, at 92 (Aug. 8,
2001).

**WTCP's Response to Paragraph No. 16:**

WTCP does not dispute the substance of Paragraph No. 16.

However, Paragraph No. 16 is not supported by admissible evidence to the extent it

cites the inadmissible GMAC Commercial Mortgage Securities, Inc., Confidential Offering

Circular (the "Offering Circular") for the proposition that "$491 million [was] paid by WTCP and

$125 million [was] paid by Westfield LLC", and, therefore, those statements should be

disregarded.[8]

Further, the facts alleged by Paragraph No. 16 are not material to the issues raised by

this motion.

---

[8]    The Offering Circular is inadmissible as evidence because it is hearsay, is based on hearsay, and
itself concedes it may not be accurate. *See* Cross Motion to Strike Br. at 5, 15-16.

**Movants' Statement Paragraph No. 17:**

The $3.2 billion value that WTCP contemporaneously assigned to the Westfield and WTCP Net Leases includes the up-front cash payment, a 99-year stream of base rents with a then present value of approximately $2.53 billion, and a 99-year stream of participating rents with a then present value of approximately $65 million. Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 164-65. WTCP's 2001 audited financial statements valued WTC 1, 2, 4, and 5 as a capital asset worth $2.8 billion. Ex. W to the Barry Decl., World Trade Center Properties LLC and Subsidiaries Consolidated Financial Statements as of December 31, 2001, at 2-3 (Apr. 22, 2002); Ex. D to the Barry Decl., Transcript of Levy Deposition, at 445-46.

**WTCP's Response to Paragraph No. 17:**

WTCP disputes Paragraph No. 17.

The subject of the first sentence of Paragraph No. 17 is inaccurate and contradicts the cited evidence. The cited evidence nowhere states, explicitly or implicitly, that WTCP ascribed a dollar "value" to the Net Leases, much less a "$3.2 billion value." To the contrary, the cited evidence merely concerns how the Port Authority's "Staff and the Advisors have valued," from the Port Authority's standpoint, some of the payments under the Net Leases (using a chosen discount rate). Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 164 ("Staff and the Advisors have valued this stream of fixed rental payments, in present value terms, at approximately $2.419 billion."); *id.* at 165 ("Staff and the Advisors have valued this stream of participating rental payments, in present value terms, at approximately $65 million."); *id.* ("The Advisors have valued this stream of additional base rental payments, in present value terms, at approximately $111 million."). To the extent that the first sentence refers to Paragraph No. 15 as support for its assertion that WTCP ascribed a dollar amount to the value to WTCP of the Net Leases, such assertion is inaccurate and not supported by evidence. *See* WTCP's Response to Paragraph No. 15.

The first sentence of Paragraph No. 17 is also inaccurate insofar as it asserts the "99-year stream of base rents" had "a then present value of approximately $2.53 billion." The cited evidence actually states "$2.419 billion" in value to the Port Authority. Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 164.

The second sentence of Paragraph No. 17 — which asserts "WTCP's 2001 audited financial statements valued WTC 1, 2, 4, and 5 as a capital asset worth $2.8 billion" — is inaccurate and contradicts the cited evidence. The cited evidence — pages 2 and 3 of World Trade Center Properties LLC and Subsidiaries Consolidated Financial Statements as of December 31, 2001 (the "2001 Financial Statement") and two pages of deposition testimony by Michael Levy — does not purport to "value" or ascribe a "worth" to the Premises.

The 2001 Financial Statement provides the accounting treatment of the Net Leases at their inception and then as a result of the destruction of the Premises. The 2001 Financial Statement does not address the accounting treatment of the Premises, much less place an accounting, economic or market value on the Premises.

The 2001 Financial Statement notes that the Net Leases at their inception were, for accounting purposes, recorded on the liability side of the balance sheet as a capital lease obligation in the amount of $2.8 billion, which represented the present value of the Fixed Minimum Rent and the Additional Base Rent that WTCP was required to make to the Port Authority under the Net Leases:

> The Net Leases have been accounted for as capital leases in the Company's consolidated financial statements. At inception of the Net Leases, a capital lease obligation (the "Capital Lease Obligation") of $2.8 billion was recorded equal to the present value of the Fixed Minimum Rent and Additional Base Rent, using a discount rate of 8%.

Barry Decl. Exh. W (2001 Financial Statement) at 8. The 2001 Financial Statement also notes that the Fixed Minimum Rent and the Additional Base Rent are only two of the seven categories of payment obligations WTCP was required to make to the Port Authority under the Net Leases.[9] The Capital Lease Obligation, which was recorded at $2.8 billion, therefore, excluded other

---

[9]     The 2001 Financial Statement identifies the following seven categories of payments WTCP was obligated to make to the Port Authority under the Net Leases: (1) Initial Payment in the amount of $491.3 million; (2) Fixed Minimum Rent; (3) Participating Rent; (4) Additional Base Rent, (5) the payments due by the Port Authority to the City of New York in lieu of taxes ("PILOT") under existing agreements; (6) payments due to the New York Power Authority; and (7) certain other amounts described in the Net Leases. Barry Decl. Exh. W (2001 Financial Statement) at 8.

payments WTCP was required to make under the Net Leases, including (1) the Participating Rent, (2) the PILOT payments, (3) payments to the New York Power Authority, and (4) certain other amounts as described in the Net Leases.  Barry Decl. Exh. W (2001 Financial Statement) at 8.

The 2001 Financial Statement at year end recorded the Net Leases on the liability side of their balance sheet as a capital lease obligation in the amount of $2.270291 billion.  Barry Decl. Exh. W (2001 Financial Statement) at third unnumbered page.

The 2001 Financial Statement noted that the Net Leases at their inception were, for accounting purposes, recorded on the asset side of the balance sheet as "property and equipment."

> At inception, the Initial Payment, Capital Lease Obligation and the related transaction costs were recorded as property and equipment on the Company's consolidated balance sheet.

Barry Decl. Exh. W (2001 Financial Statement) at 8.

In accounting for the impact of the destruction of the Premises, WTCP, pursuant to Emerging Issues Task Force Abstract 01-10 and 01-13,

> was required to write-off the property and equipment and related deferred assets ("Impaired Assets") as the carrying value of such assets were impaired when the Properties were destroyed by the Terrorist Attacks.

Barry Decl. Exh. W (2001 Financial Statement) at 2.  The 2001 Financial Statement described the amount of the write-off as follows:

> Management has estimated the Company's financial reporting loss from the Terrorist Attacks is equivalent to the carrying value of the Impaired Assets, which was approximately $2.8 billion.

Barry Decl. Exh. W (2001 Financial Statement) at 2.

Thus, as shown above, the 2001 Financial Statement ascribes "$2.8 billion" to the "carrying value" of the "Impaired Assets" as that defined term is employed.  Barry Decl. Exh. W (2001 Financial Statement) at 2, 3.  The 2001 Financial Statement does not purport to ascribe an economic or market value to the Net Leases, nor does it address, much less place an accounting, economic or market value on, the Premises, as incorrectly asserted by the second sentence of Paragraph No. 17.

Similarly, the two cited pages of deposition testimony by Michael Levy do not support the assertion in the second sentence of Paragraph No. 17 that the 2001 Financial Statement valued the Premises at $2.8 billion. Indeed, although the two cited pages of Mr. Levy's deposition testimony concern accounting issues, there is no indication that Mr. Levy was asked about, or that his answers concerned, the 2001 Financial Statement. Moreover, even if the accounting issues discussed in the two cited pages of deposition testimony by Michael Levy did in fact relate to the 2001 Financial Statement, Mr. Levy in those two pages nowhere discussed the accounting, economic or market value of the Premises. Rather, Mr. Levy discussed the accounting treatment of the Net Leases. Mr. Levy testified that the Net Leases were carried on WTCP's books as an asset and that the amount at which the Net Leases were carried on WTCP's books was not WTCP's real cost or the value to WTCP of this asset. Barry Decl. Exh. D (Transcript of Deposition of Michael L. Levy, dated June 3, 2002) at 446:2-10 ("It's the accounting treatment of how you handle a lease once it's deemed to be a capitalized asset . . . it's not truly a real cost figure."). Accordingly, the two cited pages of deposition testimony by Michael Levy do not support, but rather controvert, the assertion in the second sentence of Paragraph No. 17 that WTCP's 2001 financial statement valued the Premises at $2.8 billion.

Further, the facts alleged by Paragraph No. 17 are not material to the issues raised by this motion.

### Movants' Statement Paragraph No. 18:

Section 15.1 of each Agreement of Lease provides that:

"If the Premises (other than the Appurtenances) or any structures, improvements, fixtures and equipment, furnishings and physical property located thereon, or any part thereof, shall be damaged or destroyed by fire, the elements, the public enemy or other casualty, or by reason of any cause whatsoever and whether partial or total, the Lessee, at its sole cost and expense, and whether or not such damage or destruction is covered by insurance proceeds sufficient for the purpose, shall remove all debris resulting from such damage or destruction, and shall rebuild, restore, repair and replace the Premises (other than the Appurtenances) and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, to the extent feasible, prudent

> and commercially reasonable, with the plans and specifications for the same as they existed prior to such damage or destruction or, with the consent in writing of the Port Authority, which consent shall not be unreasonably withheld, conditioned or delayed, make such other repairs, replacements, changes or alterations as is mutually agreed to by the Port Authority and the Lessee."

Ex. L to the Barry Decl., Agreement of Lease - 1 World Trade Ctr., sec. 15.1; Ex. M to the Barry Decl., Agreement of Lease - 2 World Trade Ctr., sec. 15.1; Ex. N to the Barry Decl., Agreement of Lease - 4 World Trade Ctr., sec. 15.1; Ex. O to the Barry Decl., Agreement of Lease - 5 World Trade Ctr., sec. 15.1.

**WTCP's Response to Paragraph No. 18:**

WTCP does not dispute Paragraph No. 18.

**Movants' Statement Paragraph No. 19:**

Section 16.1 of each Agreement of Lease provides that 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC (the "Special Purpose Entities"):

> "Notwithstanding anything contained in this Agreement to the contrary, the Lessee and its direct or indirect partners (general or limited), members, shareholders, directors, officers, agents and employees, and their respective successors and assigns, shall not be charged personally with any liability or held personally liable under any term or provision of this Agreement or because of its execution or attempted execution (including in connection with the execution of any certificate or instrument delivered to the Port Authority or Code Compliance Office by any such party) or because of any breach or attempted or alleged breach hereof[.]" Furthermore, "the Port Authority shall have no cause of action against [the Special Purpose Entity] to enforce the terms, covenants, conditions, warranties, and obligations of [the Special Purpose Entity] under this Agreement other than (i) an action against [the Special Purpose Entity] to remove [the Special Purpose Entity] from possession during the continuance of an Event of Default following the effectiveness of a Termination Notice in accordance with Section 21.1, or (ii) an action against [the Special Purpose Entity] to collect a judgment or other judicial process or arbitration award requiring payment of money by [the Special Purpose Entity] from any Gross Revenues, insurance proceeds, and condemnation awards thereafter payable to [the Special Purpose Entity] with respect to the Premises, and the Port Authority shall look solely to [the Special Purpose Entity's] estate and interest in the Premises (including, without limitation, any Gross Revenues, insurance proceeds, and condemnation awards thereafter payable to [the Special Purpose Entity] with respect to the Premises) and the Port Authority's sole remedy in the event of any such breach or default by [the Special Purpose Entity] hereunder shall be to terminate [the Special Purpose Entity's] estate and interest in the Premises and, subject to the provisions of Section 21.1 below, to collect a judgment or other judicial process or arbitration award requiring payment of money by [the Special Purpose Entity] from any Gross Revenues, insurance proceeds, and condemnation awards thereafter payable to [the Special

Purpose Entity] with respect to the Premises, subject nevertheless to the rights of a Mortgagee to cure such breach or default in accordance with the applicable provisions of this Agreement."

Ex. L to the Barry Decl., Agreement of Lease - 1 World Trade Ctr., sec. 16.1; Ex. M to the Barry Decl., Agreement of Lease - 2 World Trade Ctr., sec. 16.1; Ex. N to the Barry Decl., Agreement of Lease - 4 World Trade Ctr., sec. 16.1; Ex. O to the Barry Decl., Agreement of Lease - 5 World Trade Ctr., sec. 16.1.

## WTCP's Response to 19:

WTCP does not dispute Paragraph No. 19.

However, the facts alleged by Paragraph No. 19 are not material to the issues raised by this motion.

## Movants' Statement Paragraph No. 20:

The World Trade Center net leases required WTCP to insure the property against loss, including destruction by terrorists. Ex. L to the Barry Decl., Agreement of Lease - 1 World Trade Ctr., sec. 14.1.1; Ex. M to the Barry Decl., Agreement of Lease - 2 World Trade Ctr., sec. 14.1.1; Ex. N to the Barry Decl., Agreement of Lease - 4 World Trade Ctr., sec. 14.1.1; Ex. O to the Barry Decl., Agreement of Lease - 5 World Trade Ctr., sec. 14.1.1.

## WTCP's Response to Paragraph No. 20:

WTCP disputes Paragraph No. 20.

Paragraph No. 20 is inaccurate and contradicts the cited evidence. The cited Net Leases did not require insurance against destruction by terrorists. What the Net Leases actually require is fire and property damage insurance, with no standard exclusion for terrorist acts provided that the deletion of the standard exclusion for terrorist acts is available at commercially reasonable rates. Barry Decl. Exhs. L, M, N and O (Net Leases) §§ 14.1, 14.1.1.

Further, the facts alleged by Paragraph No. 20 are not material to the issues raised by this motion.

## Movants' Statement Paragraph No. 21:

WTCP fulfilled this obligation by obtaining even more insurance than the $1.5 billion per occurrence required by the net leases and previously maintained by the Port Authority. As of September 11, 2001, WTCP had insured the World Trade Center for $3.5468 billion per occurrence. Ex. R to the Barry Decl., *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 158 (2d Cir. 2003). The amount was set by WTCP's lender, GMAC. It was intended to cover the replacement property value of the World Trade Center plus "several years of rental income." Ex. S to the Barry Decl., *SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, No. 01-CV-

9291, Trial Tr., at 1368-69, (S.D.N.Y. Oct. 27, 2004) (trial testimony of Silverstein Properties Risk Manager Robert Strachan).

**WTCP's Response to Paragraph No. 21:**

   WTCP disputes Paragraph No. 21.

   The first two sentences of Paragraph No. 21 are not supported by admissible evidence because they cite to the judicial opinion *World Trade Ctr. Props. LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir. 2003) (the "*Hartford* Opinion") (Barry Decl. Exh. R).[10]

   The first sentence of Paragraph No. 21 is not supported by the cited inadmissible *Hartford* Opinion. The inadmissible *Hartford* Opinion nowhere discusses (i) WTCP's insurance obligations under the Net Leases; (ii) whether the WTCP fulfilled the insurance obligations under the Net Leases; (iii) the amount of insurance maintained previously by the Port Authority; or (iv) whether WTCP obtained more insurance than the amount of insurance maintained previously by the Port Authority.[11]

   The third sentence of Paragraph No. 21 — which provides "The amount [of WTCP's insurance] was set by WTCP's lender, GMAC" — is inaccurate and not supported by the cited evidence. The cited two pages of trial testimony nowhere state that GMAC set the amount of WTCP's insurance. Barry Decl. Exh. S (*SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, No. 01-CV-9291, Trial Tr., at 1368-69, (S.D.N.Y. Oct. 27, 2004) (the "*SR Int'l* Opinion").

   The third sentence of Paragraph No. 21 — which provides "It [the amount of insurance] was intended to cover the replacement property value of the World Trade Center plus 'several years of rental income'" — is inaccurate and contradicted by the cited evidence in several respects.

   First, the cited evidence nowhere states WTCP's intended purpose for procuring insurance in the amount that it did. What the cited evidence actually says is that GMAC's

---

[10] The *Hartford* Opinion is inadmissible as evidence because it is hearsay and does not qualify for any exception to the hearsay rule. *See* Cross Motion to Strike Br. at 8, 19-20.

[11] The only reference in the *Hartford* Opinion to insurance amounts is the amount of insurance was "approximately $3.5 billion 'per occurrence.'" Barry Decl. Exh. R (*Hartford* Opinion) at 158.

reasoning for the amount of insurance it wanted WTCP to procure was: (i) "$663 million" was needed to satisfy "their amount of debt"; (ii) "$1.5 billion" was added to "cover the amount that would go to the Port Authority"; and (iii) "$1.3 billion" was added "to cover several years of rent." Barry Decl. Exh. S (*SR Int'l* Opinion) at 1368:19-1369:9.

Second, the third sentence of Paragraph No. 21 is inaccurate and contradicts the cited evidence by (i) failing to refer to the "amount of debt" as one of GMAC's reasons for the amount of insurance it wanted WTCP to procure; (ii) failing to refer to "the amount that would go the Port Authority" as one of GMAC's reasons for the amount of insurance it wanted WTCP to procure; (iii) improperly asserting that "cover[ing] the replacement property value" was one of GMAC's reasons for the amount of insurance it wanted WTCP to procure, whereas the cited evidence nowhere mentions "replacement property value"; and (iv) misquoting the cited evidence by using the quoted phrase, "several years of rental income," whereas the cited evidence uses the phrase, "several years of rent." Barry Decl. Exh. S (*SR Int'l* Opinion) at 1369.

The third sentence of Paragraph No. 21 is controverted by the Net Leases insofar as it asserts that the purpose of WTCP's insurance was only for "replacement property value" and "'several years of rental income.'" The Net Leases mandate that WTCP maintain insurance for many types of hazards, including, but not limited to, fire and property damage insurance, insurance for flood and earthquakes, loss of revenue/business interruption insurance, and commercial general liability insurance. Barry Decl. Exhs. L, M, N and O (Net Leases) § 14.

Further, the facts alleged by Paragraph No. 21 are not material to the issues raised by this motion.

### Movants' Statement Paragraph No. 22:

After September 11, 2001, WTCP and its insurers disputed whether the terrorist attack was one or two occurrences. A series of jury verdicts and appeals on this issue resulted in rulings that WTCP was insured for $4.6 billion. Ex. X to the Barry Decl., *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.*, 467 F.3d 107, 114-18, 140 (2d Cir. 2006).

**WTCP's Response to Paragraph No. 22:**

WTCP disputes Paragraph No. 22.

Paragraph No. 22 is not supported by admissible evidence because it cites to the judicial opinion *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.,* 467 F.3d 107 (2d Cir. 2006) (the "*SR* Opinion").[12]

Nevertheless, Paragraph No. 22's second sentence's assertion — that "jury verdicts and appeals on this issue resulted in rulings that WTCP was insured for $4.6 billion" — is not supported by the cited inadmissible *SR* Opinion, which nowhere mentions a single ruling stating the amount for which WTCP was insured, much less that the total from all "rulings" equaled $4.6 billion.

Further, the facts alleged by Paragraph No. 22 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 23:**

WTCP has already received, or based upon existing agreements with its insurers, will receive, a total of no less than $4,091,364,039 of the $4,581,794,675 in insurance payments made and to be made by their insurers. A portion of the insurance payments was allocated to the retail portion of the WTC complex based on a formula. No more than $490,430,635 was allocated to the retail portion of the Complex. Ex. T to the Barry Decl., Wachtell, Lipton, Rosen & Katz, WTCP Main Site Plaintiffs - Property Insurance Payments Received and to be Received, by Insurance Carrier.

**WTCP's Response to Paragraph No. 23:**

WTCP disputes Paragraph No. 23.

Paragraph No. 23 is not supported by admissible evidence because it cites to and relies upon Exhibit T to the Barry Declaration (the "FZWZ Payment Analysis"), which is inadmissible as evidence.[13]

---

[12]     The *SR* Opinion is inadmissible as evidence because it is hearsay and does not qualify for any exception to the hearsay rule. *See* Cross Motion to Strike Br. at 9, 21-22.

[13]     The FZWZ Payment Analysis is inadmissible as evidence because it was provided to the Aviation Defendants as a courtesy and aid on the express, written condition that it could not be used as evidence or as an admission. *See* Cross Motion to Strike Br. at 11, 23-25.

In any event, Paragraph No. 23 is inaccurate and not supported by the cited inadmissible FZWZ Payment Analysis in several respects.

First, the first sentence in Paragraph No. 23 incorrectly asserts that WTCP will receive "a total of no less than $4,091,364,039" in insurance payments. The inadmissible FZWZ Payment Analysis merely provides that the amount allocated to WTCP is $4,091,364,039; it does not provide that WTCP will receive "no less than" this amount. Barry Decl. Exh. T (FZWZ Payment Analysis).

Second, the second sentence in Paragraph No. 23 is not supported by the cited inadmissible FZWZ Payment Analysis insofar as it asserts "[a] portion of the insurance payments was allocated to the retail portion of the WTC complex based on a formula." The cited inadmissible FZWZ Payment Analysis nowhere makes reference to a "formula" used to allocate the insurance payments. Barry Decl. Exh. T (FZWZ Payment Analysis).

Third, the third sentence in Paragraph No. 23 incorrectly asserts that "the retail portion of the Complex" was allocated "[n]o more than $490,430,635." The cited inadmissible FZWZ Payment Analysis merely provides that the amount allocated to "Westfield/WTC Retail" is "$490,430,635"; it does not provide that the retail portion will receive "[n]o more than" this amount. Barry Decl. Exh. T (FZWZ Payment Analysis).

Paragraph No. 23 — to the extent it purports to assert that the insurance monies received by WTCP are the unconditional property of WTCP — is controverted for two reasons. First, the express terms of the four Net Leases controvert the assertion that the insurance monies received by WTCP are the unconditional property of WTCP. The Net Leases provide that insurance proceeds arising from destruction to the Premises shall be made available for the cost of building replacement buildings:

> If such damage or destruction as is described in Section 15.1 is covered by insurance then, subject to the provisions of Subsection 15.2.1, such proceeds shall be made available for and applied to the payment of the cost of the rebuilding, restoration, repair, replacement and alteration work required to be performed by the Lessee under the provisions of this Agreement.

Barry Decl. Exhs. L, M, N and O (Net Leases) § 15.2.  The Net Leases also provide that WTCP

will receive such insurance money only if there is a balance remaining after replacement buildings

are built.  Barry Decl. Exhs. L, M, N and O (Net Leases) § 15.4.

Second, the settlement agreements between WTCP and its insurers controvert the

assertion that the insurance monies received by WTCP are the unconditional property of WTCP.

Many of settlement agreements specify that WTCP may not use the insurance monies unless they

are dedicated to certain expenses, such as building replacement buildings, lost rent, or business

interruption.  Levy Decl. Exh. 6.  Other settlement agreements provide that WTCP may not use the

monies unless certain contingent conditions are met.  *See* Levy Decl. Exh. 12.

Further, facts alleged by Paragraph No. 23 are not material to the issues raised by

this motion, both because they are premature at this stage of the action, and because they fail to

address whether the insurance payments received by WTCP have the requisite correspondence or

linkage, pursuant to CPLR 4545(c), to the value of the lost property — the specific category of loss

claimed by the Aviation Defendants as WTCP's sole damages.

**Movants' Statement Paragraph No. 24:**

The value of insurance payments received or projected to be received by WTCP,
discounted to September 11, 2001, at the rate earned by short-term Treasury instruments
(compounded annually) is $3.5 billion.  Declaration of Rajiv Gokhale ("the Gokhale Decl."), at
¶ 3.  The value of insurance payments received or projected to be received by WTCP, discounted
to September 11, 2001, at a simple interest rate of 6% annually, is $3.2 billion.  *Id.* at ¶ 4.  The
value of insurance payments received or projected to be received by WTCP, discounted to
September 11, 2001, at a simple interest rate of 6% annually, is $3 billion.  *Id.* at ¶ 5.

**WTCP's Response to Paragraph No. 24:**

WTCP disputes Paragraph No. 24.

Paragraph No. 24 is not supported by admissible evidence because it cites to and

relies upon the inadmissible Gokhale Declaration.[14]

---

[14]    The Gokhale Declaration is inadmissible as evidence because it purports to be predicated on a
document that was provided to the Aviation Defendants as a courtesy and aid on the express, written
condition that it could not be used as evidence or as an admission, and because the referenced inadmissible
document does not even provide the information presumed by the Gokhale Declaration.  *See* Cross Motion
to Strike Br. at 11-12, 26-27.

Paragraph No. 24 is inaccurate and contradicts the cited inadmissible Gokhale Declaration in several respects.

The first sentence of Paragraph No. 24 incorrectly asserts that "[t]he value of insurance payments received or projected to be received by WTCP, discounted to September 11, 2001, at the rate earned by short-term Treasury instruments (compounded annually) is $3.5 billion." Actually, this figure is put at $3.6 billion by the inadmissible Gokhale Declaration. Gokhale Decl. ¶ 3.

The second sentence of Paragraph No. 24 incorrectly asserts that "[t]he value of insurance payments received or projected to be received by WTCP, discounted to September 11, 2001, at a simple interest rate of 6% annually is $3.2 billion." Actually, this figure is put at $3.4 billion by the inadmissible Gokhale Declaration.  Gokhale Decl. ¶ 4.

The third sentence of Paragraph No. 24 incorrectly asserts that "[t]he value of insurance payments received or projected to be received by WTCP, discounted to September 11, 2001, at a simple interest rate of 6% annually is $3 billion."  The third sentence cites to Paragraph No. 5 of the Gokhale Declaration, which actually supplies a figure of $3.1 billion.  Gokhale Decl. ¶ 5.  The third sentence is also inaccurate because it refers to 6% simple interest, whereas Paragraph No. 5 of the Gokhale Declaration actually refers to 9% simple interest.  Gokhale Decl. ¶ 5.

Paragraph No. 24 — to the extent it purports to assert that the insurance monies received by WTCP are the unconditional property of WTCP — is controverted for the two reasons set forth in response to Paragraph No. 23.

Further, the facts alleged by Paragraph No. 24 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 25:**

At the rate earned by short-term Treasury instruments (compounded annually), with interest running to the date that each insurance payment has been or is projected to be received, WTCP's $2.8 billion loss accrues to $3.04 billion. *Id.* at ¶ 8.  At a simple interest rate of 6% annually, with interest running to the date that each insurance payment has been or is projected to be received, WTCP's $2.8 billion claim accrues to $3.2 billion. *Id.* at, ¶ 9.  At a simple interest

rate of 9% annually, with interest running to the date that each insurance payment has been or is projected to be received, WTCP's $2.8 billion claim accrues to $3.4 billion. *Id.* at ¶ 10.

**WTCP's Response to Paragraph No. 25:**

WTCP disputes Paragraph No. 25.

Paragraph No. 25 is not supported by admissible evidence because it cites to and relies upon the inadmissible Gokhale Declaration.

Paragraph No. 25 — by referring to "WTCP's $2.8 billion loss" and "WTCP's $2.8 billion claim" — is not supported by the inadmissible Gokhale Declaration, which states that it assumes WTCP's loss is $2.8 billion. Gokhale Decl. ¶ 7. Paragraph No. 25's unsupported references to "WTCP's $2.8 billion loss" and "WTCP's $2.8 billion claim" are also controverted by WTCP Cross-Claim Plaintiffs' Updated Damages Disclosure: 1, 2, 4, and 5 World Trade Center (April 23, 2007) ("WTCP's Updated DDF"), which provides that as of April 23, 2007, the preliminary estimate of WTCP's loss and claim is approximately $12.3 billion, discounted to September 11, 2001. Barry Decl. Exh. V (WTCP's Updated DDF).

Further, the facts alleged by Paragraph No. 25 are not material to the issues raised by this motion.

**Movants' Statement Paragraph No. 26:**

WTCP's claim for total damages for WTC 1, 2, 4, and 5 is approximately $12.3 billion plus prejudgment interest. Ex. U to the Barry Decl., Transcript of March 18, 2008 Hearing, at 43; Ex. V to the Barry Decl., WTCP Cross-Claim Plaintiffs' Updated Damage Disclosure: 1, 2, 4, and 5 World Trade Center (Apr. 23, 2007).

**WTCP's Response to Paragraph No. 26:**

WTCP disputes Paragraph No. 26.

Paragraph No. 26 — which provides "WTCP's claim for total damages for WTC 1, 2, 4, and 5 is approximately $12.3 billion plus prejudgment interest" — is not supported by admissible evidence insofar as it cites to a statement made by Mr. Barry regarding the amount of WTCP's claim. *See* Strike Mem. at 8, 17-18.

Paragraph No. 26 is inaccurate and contradicts WTCP's Updated DDF in several respects.

First, Paragraph No. 26 is inaccurate and not supported by WTCP's Updated DDF, as that document provides a damages approximation from more than a year ago. WTCP's Updated DDF was only a preliminary estimate as of April 23, 2007. Barry Decl. Exh. V (WTCP's Updated DDF) at 2.[15]

Second, Paragraph No. 26 is inaccurate and contradicts WTCP's Updated DDF insofar as it neglects to note that the April 23, 2007 damages approximation is merely a preliminary estimate. *Id.* ("The actual costs of replacing the destroyed premises . . . are not precisely quantifiable at this time because plans and specifications for the construction of replacement buildings are not complete, and the costs of construction are not finalized."; describing claim amount as "[t]he preliminary damages estimates"; "Such damages are estimated to be . . . ."). WTCP's Updated DDF also provides that the April, 2007 preliminary estimate of the approximate damages may be updated:

> The information contained herein is a preliminary good faith estimate based on the information known and analyses completed to date. . . . WTCP reserves the right to update, amend and/or supplement this [claim] at any time.

Barry Decl. Exh. V (WTCP's Updated DDF) at 2.

Third, Paragraph No. 26 is inaccurate and contradicts WTCP's Updated DDF insofar as it neglects to note that the April 23, 2007 preliminary damages estimate has been discounted back to September 11, 2001. Barry Decl. Exh. V (WTCP'S Updated DDF) at 2. ("The preliminary damage estimates provided herein are expressed in terms of net present value as of September 11, 2001. Accordingly, all cash flows are discounted back to September 11, 2001.").

---

[15]    When expert discovery begins in 2009 pursuant to the Court's directive, WTCP will provide a comprehensive updated calculation of its damages that will supersede its preliminary estimate from over a year ago.

**Movants' Statement Paragraph No. 27:**

WTCP claims replacement costs of $8.4 billion.  Ex. V to the Barry Decl., WTCP Cross-Claim Plaintiffs' Updated Damage Disclosure: 1, 2, 4, and 5 World Trade Center (Apr. 23, 2007).

**WTCP's Response to Paragraph No. 27:**

WTCP disputes Paragraph No. 27.

Paragraph No. 27 — which asserts "WTCP claims replacement costs of $8.4 billion" — is inaccurate and contradicts the cited WTCP's Updated DDF in several respects.

First, Paragraph No. 27 is inaccurate and contradicts WTCP's Updated DDF insofar as it mischaracterizes the claim amount as "$8.4 billion," without qualifying that figure as an approximation and a preliminary estimate (see below).  What WTCP's Updated DDF actually says is the "Claim Amount" is "approximately $8,400,000,000."  Barry Decl. Exh. V (WTCP's Updated DDF) at 1.

Second, Paragraph No. 27 is inaccurate and not supported by WTCP's Updated DDF, as that document provides a damages approximation from more than a year ago.  WTCP's Updated DDF is accurate as of April 23, 2007.  Barry Decl. Exh. V (WTCP's Updated DDF) at 2.

Third, Paragraph No. 27 is inaccurate and contradicts WTCP's Updated DDF insofar as it neglects to note that the April 23, 2007 damages approximation is merely a preliminary estimate.  Note 2 of WTCP's Updated DDF provides:

> The actual costs of replacing the destroyed premises are expected to be approximately $8,400,000,000, but are not precisely quantifiable at this time because plans and specifications for the construction of replacement buildings are not complete, and the costs of construction are not finalized.

*Id.*  Note 3 of WTCP's Updated DDF also describes the claim amount as "[t]he preliminary damages estimates provided herein."  *Id.*  WTCP's Updated DDF provides that the preliminary estimated claim amount may be updated:

> The information contained herein is a preliminary good faith estimate based on the information known and analyses completed to date. . . . WTCP reserves the right to update, amend and/or supplement this [claim] at any time.

*Id.*

Fourth, Paragraph No. 27 is inaccurate and contradicts WTCP's Updated DDF insofar as it neglects to note that the April 23, 2007 preliminary damages estimate has been discounted back to September 11, 2001, and that actual costs as they are being incurred are greater in today's dollars. *Id.* ("The preliminary damage estimates provided herein are expressed in terms of net present value as of September 11, 2001. Accordingly, all cash flows are discounted back to September 11, 2001.").

**Movants' Statement Paragraph No. 28:**

WTCP claims damages of $3.9 billion for lost profits. *Id.*

**WTCP's Response to Paragraph No. 28:**

WTCP disputes Paragraph No. 28.

Paragraph No. 28 is inaccurate and contradicts WTCP's Updated DDF insofar as it mischaracterizes WTCP's claim as a claim for "lost profits." WTCP's Updated DDF nowhere uses the word "profits" or the term "lost profits." What WTCP's Updated DDF actually says is that WTCP's claim is for "Lost revenue and consequential damages, including but not limited to, leasing and other mitigating costs." Barry Decl. Exh. V (WTCP's Updated DDF) at 1. Note 1 of WTCP's Updated DDF similarly describes the claim:

> Damages to the business include, but are not limited to, lost revenue, consequential damages, included leasing expenses and other costs in mitigating damages, loss of tenant/customer relationships, loss of vendor relationships, loss of personnel, impaired market positions and related business losses. The destruction of the revenue generating properties resulted in the substantial impairment of what were mature, established businesses with expectations of increased revenues, lowered expenses and increased net operating income and, left in their place, the uncertain prospects of start-up enterprises with substantial upfront losses and significantly greater business risks.

Barry Decl. Exh. V (WTCP's Updated DDF) at 2.

Second, Paragraph No. 28 is inaccurate and contradicts WTCP's Updated DDF insofar as it mischaracterizes the claim amount as "$3.9 billion," without qualifying that figure as

34

an approximation and a preliminary estimate (see below). What WTCP's Updated DDF actually says is the "Claim Amount" is "approximately $3,900,000,000." Barry Decl. Exh. V (WTCP's Updated DDF) at 1. Note 1 of WTCP's Updated DDF similarly provides: "Such damages are estimated to be approximately $3,900,000,000." Barry Decl. Exh. V (WTCP's Updated DDF) at 2.

Third, Paragraph No. 28 is inaccurate and is not supported by WTCP's Updated DDF, as that document provides a damages approximation from more than a year ago. WTCP's Updated DDF is accurate as of April 23, 2007. *Id.*

Fourth, Paragraph No. 28 is inaccurate and contradicts WTCP's Updated DDF insofar as it neglects to note that the April 23, 2007 damages approximation is merely a preliminary estimate. Note 3 of WTCP's Updated DDF describes the claim amount as "[t]he preliminary damage estimates provided herein." *Id.* WTCP's Updated DDF provides that the preliminary estimated claim amount may be updated:

> The information contained herein is a preliminary good faith estimate based on the information known and analyses completed to date. . . . WTCP reserves the right to update, amend and/or supplement this [claim] amount at any time.

*Id.*

Fifth, Paragraph No. 28 is inaccurate and contradicts WTCP's Updated DDF insofar as it neglects to note that the April 23, 2007 preliminary damages estimate has been discounted back to September 11, 2001. *Id.* ("The preliminary damage estimates provided herein are expressed in terms of net present value as of September 11, 2001. Accordingly, all cash flows are discounted back to September 11, 2001.").

**WTCP's Counter-Statement of Material Facts**

29.    The Port Authority, formerly known as "The Port of New York Authority," is a non-profit bi-state agency formed in 1921 by New York and New Jersey in connection with the creation of a Port of New York District, created to carry out a public trust.  To that end, the two states pledged "faithful co-operation in the future planning and development of the port of New York, holding in high trust for the benefit of the nation the special blessings and natural advantages thereof." N.Y. UNCONSOL. LAW §§ 6401 *et seq*. (McKinney 2000); N.J. STAT. ANN. §§ 32:1-1 *et seq*.(West 1990).

30.    In 1962, in an effort to reverse the decline in importance of the Port of New York and the lower Manhattan business district (Garvin Decl. ¶¶ 17-19), New York and New Jersey enacted complementary legislation directing the creation of the World Trade Center at a specific site in lower Manhattan (defined as the "Hudson tubes-world trade center area") centered around the PATH train's terminus.  N.Y. UNCONSOL. LAW §§ 6601 *et seq*.; N.J. STAT. ANN. § 32:1-35.50 to 32:1-35.68 (the "WTC Legislation").

31.    The states determined that the unification of this "facility of commerce" and the PATH train system "will materially assist in preserving for the two states and the people thereof the material and other benefits of a prosperous port community."  N.Y. UNCONSOL. LAW § 6601(7); N.J. STAT. ANN. § 32:1-35.50(7).  They also determined that the Port's undertaking of the "unified" World Trade Center project "has the single object of preserving, and is part of a unified plan to aid in the preservation of, the economic well-being of the northern New Jersey-New York metropolitan area and is found and determined to be in the public interest."  N.Y. UNCONSOL. LAW § 6601(9); N.J. STAT. ANN. § 32:1-35.50(9); Garvin Decl. ¶¶ 16-19.

32.    That public interest objective gave the World Trade Center a far broader purpose than just providing room for tenants.  Garvin Decl. ¶¶ 18-19, 21-22, 31, 42, 45.

33.    The unified WTC project contemplated that the Port Authority would (a) operate, improve and extend the PATH public transportation system between New York and New Jersey to permit the transfer of passengers to other facilities; (b) centralize in one location the "servicing functions and activities connected with the oceanborne and overseas airborne trade and commerce" which were "presently performed in various, scattered locations"; (c) provide for "more efficient and economical facilities for the exchange and buying, selling and transportation of commodities and other property in world trade and commerce" to insure that the Port of New York receives its "rightful share" of "cargo volumes generated by the economy of the nation"; (d) unify at the WTC site "appropriate governmental, administrative and other services connected with or incidental to transportation of persons and property and the promotion and protection of port commerce"; and (e) provide "a central locale for exhibiting and otherwise promoting the exchange and buying and selling of commodities and property in world trade and commerce." N.Y. UNCONSOL. LAW § 6601; N.J. STAT. ANN. § 32:1-35.50.

34.    The Port's "effectuation" of the World Trade Center at its specific site is "an essential government function" for a public purpose and the public good.

> The effectuation of the world trade center, the Hudson tubes and the Hudson tubes extensions, . . . are and will be in all respects for the benefit of the people of the States of New York and New Jersey, for the increase of their commerce and prosperity and for the improvement of their health and living conditions; and the port authority and any subsidiary corporation incorporated for any of the purposes of this act shall be regarded as performing an essential governmental function in undertaking the effectuation thereof, and in carrying out the provisions of law relating thereto.

N.Y. UNCONSOL. LAW § 6610; N.J. STAT. ANN. § 32:1-35.59.

35.    "Effectuation" is defined in the WTC Legislation as including the "establishment, acquisition, construction, development, maintenance, operation, improvement (by way of betterments, additions or otherwise) and rehabilitation" of "a project or any facility or part of

a facility constituting a portion of a project." N.Y. UNCONSOL. LAW § 6602; N.J. STAT. ANN. § 32:1-35.51.

36.     The World Trade Center complex, officially dedicated in 1973, consisted of a 16-acre public site with a street level plaza, street level shopping and an underground shopping mall, a transportation terminal for the New York-New Jersey PATH trains, a subway hub offering direct access to several NYC subway lines, six buildings, including the Twin Towers, and included what was believed to be the first hotel to open in downtown Manhattan since 1836. Garvin Decl. ¶ 35.

37.     The constituent parts of the World Trade Center complex were highly integrated, sharing miles of below-grade space, mechanical systems, common air conditioning and heating ducts, dedicated electrical service, an extensive fire detection and voice evacuation paging system and a common security force — the Port Authority Police Department. Garvin Decl. ¶¶ 35, 55. Public passageways directed persons from the PATH trains into the shopping mall — one of the most successful retail malls in the United States — and out onto the plaza or into one of the many connecting subway lines. Garvin Decl. ¶ 35. Land bridges connected the World Trade Center complex to 7 World Trade Center, Battery Park City, and surrounding City streets. Garvin Decl. ¶ 54.

38.     The WTC complex brought to lower Manhattan a mass of workers, business invitees, tourists and eventually residents, completely altering the downtown economy despite the fact that the mammoth complex, in its early years, never itself made money. Garvin Decl. ¶ 33.

39.     During the 1990s, nearly 400 companies had offices in the World Trade Center complex, including export-oriented and blue-chip international tenants, financial companies, federal and state agency offices and the Port Authority. Garvin Decl. ¶ 46.

40.     On a typical weekday, 40,000 people worked in the towers, and approximately 200,000 people visited the World Trade Center complex including the Observation Deck, Windows on the World restaurant and the centrally located Austin J. Tobin Plaza. Garvin Decl. ¶ 46.

41.     The height and unique architecture of the "Twin Towers" of the World Trade Center complex reshaped the skyline of New York and enhanced New York's status as an international tourist attraction. Garvin Decl. ¶ 37.

42.     The towers required use of cutting edge engineering and design innovations. Garvin Decl. ¶¶ 39-40.

43.     The Twin Towers, at 1,368 and 1,362 feet, respectively, and 110 stories each, were the world's tallest and largest buildings when completed. Garvin Decl. ¶¶ 37-38.

44.     The Twin Towers became known worldwide, and were shown or depicted in movies, TV shows, postcards, merchandise, magazines and much more, becoming a New York symbol of the same renown as the Empire State Building or Statue of Liberty. Garvin Decl. ¶ 38.

45.     To this day, historic images of the World Trade Center and its Twin Towers remain instantly recognizable. Garvin Decl. ¶ 38.

46.     The documented cost of building the original World Trade Center, beginning in 1965, was about $1 billion. Declaration of Kerry D. Vandell, executed August 15, 2008 ("Vandell Decl.") ¶ 8. That cost would be equivalent today to about $10 billion given the inflation in construction costs. Vandell Decl. ¶ 8.

47.     No private developer would or could have built the World Trade Center when it was proposed almost fifty years ago. Garvin Decl. ¶ 41.

48.    The World Trade Center was not built on a commercial profit model; it was built to confer public benefits.  Garvin Decl. ¶¶ 18-19, 22, 34, 41-42.

49.    The World Trade Center was ideally situated and suited to serve the public purpose for which it was conceived and built.  Declaration of Sheldon Gottlieb, executed August 14, 2008 ("Gottlieb Decl.") ¶ 8; Garvin Decl. ¶¶ 32, 43-45.

50.    Long before 2001, the Port Authority periodically undertook, directly and through the use of consultants, to analyze various options for the future of the World Trade Center, including comparisons of the World Trade Center with private-sector operations.  Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161.

51.    The World Trade Center has never been offered for commercial sale and the WTC Legislation does not authorize the Port Authority to "sell" the World Trade Center.  N.Y. UNCONSOL. LAW § 6603; N.J. STAT. ANN. §§ 32:1-35.52

52.    In June of 1984, Governor Cuomo of New York and Governor Kean of New Jersey publicly announced that the World Trade Center would not be sold.  Garvin Decl. ¶ 47.

53.    Leaving aside the World Trade Center's specifically selected location, there are no comparable commercial properties of that size anywhere in Manhattan.  Gottlieb Decl. ¶¶ 25, 27.

54.    The government's overall objective with respect to the World Trade Center was not just to increase revenues to New York City, but to generate new investment infrastructure, development and housing, because the World Trade Center was not just a New York City asset, but an asset of two states and the region.  Garvin Decl. ¶ 47.

55.    In 1996, the Port again considered its options "for maximizing the value of the World Trade Center to the Port Authority and to the people of the region, involving the sale, net lease and asset management of the World Trade Center." Barry Decl. Exh. A (April 26, 2001 Port Minutes) at 161.

56.    In 1998, the Commissioners voted to lease the complex or the individual buildings that comprised the World Trade Center to a private operator while continuing ownership and control. Garvin Decl. ¶46.

57.    WTCP is in the commercial real estate business. Declaration of Michael L. Levy, executed August 11, 2008 ("Levy Decl.") ¶ 3.

58.    WTCP leased the WTC Buildings "and any replacements thereof," subject to the Port's continuing rights, duties and jurisdiction under the WTC Legislation.

59.    1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC (now known as 3 World Trade Center LLC) are the lessees on the Net Leases. Barry Decl. Exhs. L, M, N and O (Net Leases).

60.    The net lease arrangement was entered into "in furtherance of the purposes of the World Trade Center Legislation." Barry Decl. Exhs. L, M, N and O (Net Leases) Recital, at 1.

61.    Each net lease was deemed a lease of "a portion of the World Trade Center." Barry Decl. Exhs. L, M, N and O (Net Leases) Recital, at 1-2.

62.    In addition to receiving rent payments pursuant to the Net Leases, the Port Authority receives non-commercial benefit and value (Gottlieb Decl. ¶ 17; Vandell Decl. ¶ 13-14) and continues "to own, control and operate the World Trade Center pursuant to the World Trade Center legislation, and to review and enforce compliance with all codes, regulations, orders and rules set forth by the Port Authority." Barry Decl. Exhs. L, M, N and O (Net Leases) Recital, at 3.

63.     WTCP is required to comply with the Port Authority Manual, including the Port Authority's Rules and Regulations and Security Guidelines. Barry Decl. Exhs. L, M, N and O (Net Leases) Secs. 1.215, 1.254, 1.258, 6.2. WTCP is required to certify, or have the Port Authority determine, that the business conducted by each of WTCP's tenants at the World Trade Center is permitted under the WTC Legislation. Barry Decl. Exhs. L, M, N and O (Net Leases) Sec. 9.2

64.     The Port Authority was not a profit-maximizing lessor and was under political pressure to lease certain portions of the WTC complex. The Port had, and has, broader goals in the lease transaction than maximizing its income, including promoting the public interest benefit in the World Trade Center complex to the Port and the people of New York and New Jersey. Vandell Decl. ¶ 11.

65.     The Net Leases provided WTCP with approximately 10 million square feet of office space that had a very high occupancy rate — One World Trade Center and Two World Trade Center were nearly fully let and had over 400 tenants on September 11, 2001 ("September 11" or "9/11"). Levy Decl. ¶¶ 5, 6. Over 50% of the tenants of the WTC Buildings had long-term leases not set to expire until 2006 or later. Levy Decl. ¶ 7.

66.     In 2002, WTCP expected to receive from its tenants approximately $363 million in annual rental income. Levy Decl. ¶ 8. That amount was expected to increase substantially over the years. Levy Decl. ¶ 9.

67.     On September 11, the two-month old leases, for which WTCP already had paid more than half a billion dollars in rental payments, had nearly 99 years remaining. Levy Decl. ¶ 10.

68.     The July 2001 transaction was not a recent sale of the property – it was a lease subject to the Port's continued public benefit operation of the World Trade Center. Gottlieb Decl. ¶¶ 18, 23; Vandell Decl. ¶¶ 24-35.

69.     There is no market for the World Trade Center because its enormous size and integration with the PATH trains and subways at a location expressly selected by statute make it unique. Gottlieb Decl. ¶ 25; Vandell Decl. ¶¶ 25-35; Garvin Decl. ¶¶ 32, 33, 35, 44.

70.     Leaving aside the World Trade Center's specifically selected location, there are no comparable commercial properties of that size anywhere in Manhattan. Gottlieb Decl. ¶¶ 25, 27.

71.     When the WTC Buildings were completely destroyed on September 11, the tenants' leases with WTCP terminated. Levy Decl. ¶ 13.

72.     Although the WTC Buildings no longer exist and WTCP has not been receiving any rent from tenants, WTCP is not relieved of its obligations to continue making rental payments to the Port Authority. Barry Decl. Exhs. L, M, N and O (Net leases) Sec. 15.1.4.

73.     Over the last seven years, WTCP has paid the Port Authority nearly $1.2 billion in rental payments, and it must continue to make rental payments. Levy Decl. ¶ 12.

74.     Since September 11, WTCP has received no annual rental income and has lost billions of dollars in annual rental income it would have received from the former tenants of the WTC buildings. Levy Decl. ¶¶ 13-14.

75.     WTCP will continue to lose hundreds of millions of dollars in annual rental income each year until such time as the replacement buildings are built, new tenant relationships are established, and the replacement buildings are leased at or near the occupancy levels of the original WTC Buildings. Levy Decl. ¶ 15.

76.     The value of prospective rental income from the replacement buildings is less than the projected rental income for the original WTC Buildings both because there will be more than ten years with no rental income at all and because of increased uncertainty and risk once the buildings are replaced. Levy Decl. ¶ 16.

77.     Preliminary April 2007 estimates of lost revenue and consequential damages, including, but not limited to, leasing and other mitigation costs, totaled approximately $3.9 billion discounted to net present value as of September 11. Levy Decl. ¶ 16; Barry Decl. Exh. V (WTCP's Updated DDF).

78.     WTCP is obligated under the leases to build replacement buildings in accordance with the buildings' original plans and specifications or, if building in accordance with the original plans is not feasible, in accordance with revised specifications approved by the Port Authority. Barry Decl. Exhs. L, M, N and O (Net Leases) Sec. 15.1.

79.     The April 2007 preliminary estimate of the cost of building the four replacement WTC Buildings (also to be refined in WTCP's expert reports) was approximately $8.4 billion discounted to net present value as of September 11. Levy Decl. ¶ 16; Barry Decl. Exh. V (WTCP's Updated DDF).

80.     Since September 11, no buildings comparable to the WTC Buildings within the World Trade Center complex have been available for lease or purchase. Gottlieb Decl. ¶ 27.

81.     The Aviation Defendants were co-defendants with WTCP in approximately 1,200 wrongful death actions and the WTCP Plaintiffs and their affiliates were defendants in thousands of state and federal lawsuits arising out of the events of 9/11 and claims alleging

82.    respiratory and other injuries at and around the WTC site, including a pending class action on behalf of more than 10,000 persons.  Williamson Decl. ¶ 3.  WTCP spent almost seven years defending those actions and the potential liability was enormous.  Williamson Decl. ¶ 3. Most of the wrongful death plaintiffs ultimately received multi-million dollar awards from the Victim Compensation Fund (totaling over $6 billion) and settlements by Defendants in other cases have been for similar amounts per plaintiff or higher.  Williamson Decl. ¶ 4.  Certain plaintiffs' attorneys continue to sue WTCP in new actions alleging respiratory injuries despite WTCP's October 2006 dismissal from the 21 MC 100 docket.  Williamson Decl. ¶ 5.

83.    Rebuilding the World Trade Center is an undertaking of vital public importance to restore the economic and other public benefits of the World Trade Center.  Garvin Decl. ¶¶ 57-61, 72.

84.    Everyone has been touched by the destruction of the World Trade Center and its powerful absence.  Garvin Decl. ¶ 71.

85.    On September 11, Mayor Rudolph Giuliani declared: "We will rebuild: We're going to come out of this stronger than before, politically stronger, economically stronger. The skyline will be made whole again."  Garvin Decl. ¶ 68.

86.    In the days that followed September 11, a determined local, state and federal public policy mandate to rebuild emerged.  Garvin Decl. ¶ 72.  A consensus was reached among political leaders, legislators, economists, historians, architects, urban planners and countless ordinary citizens involved in the planning process that rebuilding the World Trade Center complex was essential to the City's vitality and economic health, to the preservation of the economic well-being of the Northern New Jersey-New York metropolitan area, and as an expression of public resolve to rebound from the terrorist attacks and restore what was taken from the public.  Garvin Decl. ¶ 72

87.     Redevelopment of the World Trade Center site will benefit New York in myriad ways, both in the short and long-term. Garvin Decl. ¶¶ 58-61. Because of the unique nature of the World Trade Center, the location, importance and history of the complex, and the circumstances of its destruction, failing to rebuild the World Trade Center would be devastating to the public interest. Garvin Decl. ¶¶ 41, 74.

88.     Congress responded to and supported the public consensus to rebuild the World Trade Center by providing, in the Air Transportation Safety and System Stabilization Act of 2001, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C.A. § 40101 note) (West Supp. 2008) ("ATSSSA"), that the aggregate liability of any "person with a property interest in the World Trade Center" for damages arising from the terrorist-related aircraft crashes of September 11 would be limited to the amount of "the limits of liability insurance coverage maintained by that . . . person." ATSSSA § 408(a)(1). Among other things, the provision protects the financial health of those engaged in the rebuilding effort from possible large damage awards which might destroy their ability to rebuild. 147 CONG. REC. S9594 (Sept. 21, 2001) (Statement of Sen. McCain); 147 CONG. REC. H7649 (Nov. 1, 2001) (Statement of Rep. Sensenbrenner).

89.     Covered persons under ATSSSA included WTCP, as a person with a "fee simple, leasehold or easement [interest], direct or indirect" in the World Trade Center, and affords the same limitation on liability exposure to the Aviation Defendants, without any conditions. ATSSSA § 408(a)(1).

90.     That financial protection afforded under ATSSSA was conditioned, in WTCP's case, on WTCP's not willfully defaulting on its obligation under the net leases to rebuild. ATSSSA § 408(a)(2); H.R. CONF. REP. No. 107-296, at 81 (Nov. 16, 2001), *reprinted in* 2001 U.S.C.C.A.N. 589.

91.     If WTCP had walked away from its obligation to rebuild the WTC buildings it would have lost all right to the insurance proceeds covering losses arising from the destruction of the WTC Buildings, because the net leases specifically provide that the insurance proceeds must be

available for the payment of the cost of the replacement buildings. Barry Decl. Exhs. L, M, N and O (Net Leases) Secs. 15.1, 15.2, 16.1.

92.    Immediately after the destruction of the World Trade Center on September 11, WTCP committed itself to replacing the World Trade Center, as WTCP was duty-bound to do under the Net Leases. Barry Decl. Exhs. L, M, N and O (Net Leases) Sec. 15.1.

93.    WTCP has undertaken great construction, engineering, and political challenges to replace the WTC Buildings. WTCP has cooperated with the Port Authority, the States of New York and New Jersey, the City of New York, various federal, state and city agencies and other community and citizen stakeholders to build a new World Trade Center befitting the legacy and importance of the destroyed World Trade Center. Garvin Decl. ¶¶ 62, 64, 66, 73, 85, 95, 112.

94.    A World Trade Center redevelopment plan conceived by Studio Daniel Libeskind was chosen in 2003. Garvin Decl. ¶ 101. A six-acre memorial and a museum are centerpieces of the site. Garvin Decl. ¶ 108. Surrounding the memorial space will be the WTC Transportation Hub, retail development, cultural facilities, new open spaces and the replacements for the WTC Buildings — the Freedom Tower (One World Trade Center) and Towers 2, 3, and 4. Garvin Decl. ¶ 108. Currently under construction, the WTC Transportation Hub will be a world-class gateway to our public transportation system, a downtown grand terminal that integrates the ferries, PATH, and NYC subway lines that carry commuters and millions of visitors to and from lower Manhattan. Garvin Decl. ¶ 108. In addition, two streets (Greenwich and Fulton) will be extended through the site and two new pedestrian ways (Cortlandt and Dey) will be created. Garvin Decl. ¶ 108. Just outside of the 16-acre site, Tower 5 and a Vehicle Security Center will be built after the former Deutsche Bank building at 130 Liberty Street is abated and deconstructed. Garvin Decl. ¶ 108.

95.    The work of rebuilding the World Trade Center is substantially underway: Hundreds of millions of dollars have been spent on architectural design, engineering and construction work for the replacement WTC Buildings; the foundations and footings for the WTC

Memorial and the museum are nearing completion, with steel slated to arrive soon; the Freedom

Tower is now rising above street level; the foundation work of the WTC Transportation Hub has

begun while the temporary North Access for the PATH Station has already been completed;

excavation or construction for the foundations for Towers 2, 3, and 4 and associated retail space are

underway; and two electric power substations destroyed on 9/11 have been replaced. Garvin Decl. ¶

112.

     96.    After years of litigation to collect on its policies, WTCP entered into

settlement agreements with its insurers pursuant to which the insurers agreed to pay certain amounts

to WTCP in settlement of WTCP's insurance claims (the "Settlement Agreements"). Levy Decl.

Exhs. 6-18. With one exception (Levy Decl. Exh. 12 (Settlement Agreement with Allianz Global

Risks US Ins. Co. relating to policy no. CLP 3001140, dated July 9, 2007)), none of the Settlement

Agreements allocates any specific dollar amount of the settlement payments or insurance proceeds

to any specific category of loss. Levy Decl. Exhs. 6-11, 13-18 (Settlement Agreements).

     97.    The overwhelming majority of WTCP's insurance policies insured not only

lost rental income and replacement cost (in addition to the actual cash value coverage), but also a

variety of other losses and costs, including business interruption, damage to personal property, and

consequential damages, among many others. *E.g.*, Levy Decl. Exh. 5.

     98.    Some of the settlement agreements provide that Settlement Payments are to be

used for the construction of the office towers and retail component at the World Trade Center, but

also permit the funds to be used to pay for other purposes without stating what dollar amount or

portion of the insurance funds are to be used for which category of insured loss. *E.g.*, Levy Decl.

Exh. 6 (Stipulation of Settlement with Travelers Indemnity Company and Gulf Insurance Company,

May 18, 2007), Section 3.b. Other settlement agreements state that the insureds may use the

Settlement Payments as the insureds may unanimously agree. *E.g.*, Levy Decl. Exh. 9 (London

Market Insurers Agreement with Certain Underwriters at Lloyd's, Great Lakes Reinsurance (UK)

plc, Houston Casualty Company, QBE International Insurance Ltd., Wurttembergische Versicherung

AG, September 25, 2002), Section 5.d.  Certain settlement agreements contain no provisions restricting how the insureds may use the Settlement Payments.  *E.g.*, Levy Decl. Exh. 11 (Settlement Agreement and Release with ACE Bermuda Insurance Limited, February 13, 2002).


Dated:  August 18, 2008
      New York, New York

                    FLEMMING ZULACK WILLIAMSON
                      ZAUDERER LLP

                    By
                      Richard A. Williamson, Esq.
                    One Liberty Plaza
                    New York, New York  10006
                    (212) 412-9500
                    rwilliamson@fzwz.com

                    Attorneys for Plaintiffs
                    World Trade Center Properties LLC,
                    1 World Trade Center LLC,
                    2 World Trade Center LLC,
                    3 World Trade Center LLC,
                    4 World Trade Center LLC,