UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                   :

IN RE SEPTEMBER 11 LITIGATION       :   **ORDER AND OPINION**
                                   :   **GRANTING JOINT MOTION**

-------------------------------------------------------------- :   **APPROVING PROPERTY**

WORLD TRADE CENTER PROPERTIES LLC,  :   **DAMAGE SETTLEMENTS**
et al.,
                                   :   21 MC 101 (AKH)

                   Plaintiffs,   :   08 Civ. 3719 (AKH)
                                   :   08 Civ. 3722 (AKH)

          -against-             :

UNITED AIRLINES, INC., et al.        :

                                   :

                 Defendants.   :

------------------------------------------------------------ :

WORLD TRADE CENTER PROPERTIES LLC,  :
et al.,
                                   :

                   Plaintiffs,   :

          -against-             :

AMERICAN AIRLINES, INC., et al.,    :

                 Defendants.   :

-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Plaintiffs in 18 of the 21 cases asserting property damage claims in the 21 MC

101 master calendar propose to settle with the airlines, security companies and assorted other

Aviation Defendants whom they sued for the damage inflicted by the terrorist-related aircraft

crashes on September 11, 2001.[1]  The settling plaintiffs include subrogated insurers and plaintiffs

---

[1] The settlement resolves all claims in the following cases: (1) World Trade Farmers Mkt., Inc., et al. v. United Airlines, Inc., et al., 02 Civ. 2987; (2) Certain Underwriters at Lloyd's of London, et al. v. AMR Corp., et al., 03 Civ. 131; (3) MVN Assoc., Inc., et al. v. United Airlines, Inc., et al., 04 Civ. 4577; (4) American Alternative Ins. Corp., et al. v. AMR Corp., et al., 04 Civ. 6848; (5) Barcley Dwyer Co., Inc., et al. v. AMR Corp., et al., 04 Civ.

asserting direct claims for uninsured losses relating to businesses and leasehold properties that were destroyed that fateful day.

After substantial pre-trial discovery–more than 180 depositions and millions of pages of documents–and aided by a skilled and resourceful mediator, the Honorable John Martin, retired United States District Judge, the parties involved in these cases agreed to settlements. The settling plaintiffs[2] and defendants (the "Aviation Defendants")[3] filed this motion seeking my approval of the settlement as fair and reasonable.[4]

---

7136; (6) QBE Int'l Ins. Ltd., et al. v. AMR Corp., et al., 04 Civ. 7199; (7) Mayore Estates, LLC, et al. v. AMR Corp., et al., 04 Civ. 7225; (8) Industrial Risk Insurers v. AMR Corp., et al., 04 Civ. 7231; (9) Industrial Risk Insurers v. AMR Corp., et al., 04 Civ. 7234; (10) Assurances Generales de France Iart, et al. v. AMR Corp., et al., 04 Civ. 7238; (11) Woburn Ins., Ltd. v. AMR Corp., et al., 04 Civ. 7240; (12) Great Lakes Reinsurance U.K. PLC v. AMR Corp., et al., 04 Civ. 7241; (13) Underwriter at Lloyd's, et al. v. AMR Corp., et al., 04 Civ. 7244; (14) American Reinsurance Co. v. AMR Corp., et al., 04 Civ. 7246; (15) AXA RE, et al. v. AMR Corp, et al., 04 Civ. 7248; (16) Munich Reinsur. Co. UK General Branch, et al. v. AMR Corp., et al., 04 Civ. 7294; and (17) AXA Corp. Solutions Assurance UK Branch, et al. v AMR Corp., et al., 04 Civ. 7299. In Aegis Ins. Servs., Inc., et al. v. 7 World Trade Ctr. Co., L.P., et al., 04 Civ. 7272, the settlement resolves only those claims asserted against the Aviation Defendants.  The non-settling cases— World Trade Center Properties, LLC v. United Airlines, Inc., 08 Civ. 3719 (AKH); World Trade Center Properties, LLC v. American Airlines, Inc., 08 Civ. 3722 (AKH); and Cantor Fitzgerald & Co. v. American Airlines, Inc., 04 Civ. 7318 (AKH)—involve the claims of the WTCP Plaintiffs and of Cantor Fitzgerald & Co. and its affiliates. An additional case, Cedar & Washington Associates, LLC. v. The Port Authority of New York and New Jersey, 08 Civ. 9146 (AKH), involves claims against the Aviation Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq., and is not included in the 21 MC 101 docket.

[2] The settling plaintiffs are Certain Underwriters at Lloyd's of London Comprising Syndicates No. 33, 1003, 2003, 1208, 1243, 0376; Great Lakes Reinsurance (UK), PLC; Underwriter at Lloyd's, Syndicate No. 1225; Munich-American Risk Partners 7244 GmbH; Greater New York Mutual Insurance Company; Insurance Company of Greater New York; Munich Reinsurance Company UK General Branch; Muenchener Rueckversicherunes-Gesellschaft; Woburn Insurance, Ltd.; Great Lakes Reinsurance U.K. PLC; American Alternative Insurance Corporation; The Princeton Excess & Surplus Lines Insurance Company; Munich Reinsurance America, Inc. formerly known as American Re-Insurance Company; Colisee Re (formerly known as AXA Re and successor to the interests and liabilities of SPS Reassurance); Colisee Re Canadian Branch (formerly known as AXA Re Canadian Branch and formerly known as AXA Corporate Solutions Reassurance Canadian Branch); Colisee Re Madeira Branch (formerly known as Axa Re Madiera Branch); Portman Insurance Limited (formerly known as AXA Global Risks (UK) Ltd. and successor to the interests and liabilities of Axa Reinsurance UK Plc); AXA Corporate Solutions Assurance UK Branch; AXA Insurance Company (formerly AXA CS Insurance Co.); Coliseum Reinsurance Company (formerly AXA CS Reinsurance Co. US); AXA Versicherung AG; AXA Cessions; AXA Corporate Solutions Services UK Ltd. and AXA Corporate Solutions Assurance (for itself and as successor to the interests and liabilities of AXA Corporate Solutions Assurance Canadian Branch); AXA Art Insurance Corporation; Paris Re Asia Pacific Pte. Ltd. (formerly known as AXA Re Asia Pacific Pte. Ltd.); Paris Re (Successor to the Interests and Liabilities of Compagnie Generale De Reassurance De Monte Carlo); Industrial Risk Insurers and its members; Aegis Insurance Services, Inc.; Liberty Insurance Underwriters, Inc.; National Union Insurance Company of Pittsburgh; Nuclear Electric Insurance Limited; Certain Underwriters at Lloyds Comprising Syndicates No. 1225 and 1511; Consolidated Edison Company of New York, Inc.; QBE International Insurance Ltd.; Certain Underwriters at Lloyd's, London, as members of Syndicates Numbered 1212, 1241, 79, 506, and 2791; Assurances

2

Several non-settling plaintiffs affiliated with the developer Larry Silverstein,

long-term lessee of the World Trade Center (the "WTCP Plaintiffs"),[5] filed objections to the

settlement, expressing the concern that the settlement would encroach on the liability ceilings

provided by the Air Transportation Safety and System Stabilization Act ("ATSSSA"), codified at

49 U.S.C. § 40101 note, and leave insufficient capacity to pay their claims.

For the reasons that follow, I find the proposed settlements to be fair and

reasonable; I approve them; and I order all amounts paid pursuant to the settlement agreement to

be credited against the settling defendants' respective liability ceilings.  I over-rule the objections

of the WTCP Plaintiffs and grant the relief sought by the settling parties.

---

Generales De France Iart; Assurances Generales De France; Allianz Global Risks US Insurance Company F/K/A Allianz Insurance Company; Allianz Insurance Company of Canada; Allianz Suisse Versicherungs-Gesellschaft; Allianz Versicherungs-Aktiengesellschaft; Fireman's Fund Insurance Company; Mayore Estates, LLC; 80 Lafayette Associates, LLC; Barcley Dwyer Co., Inc.; Karoon Capital Management, Inc.; N.S. Windows LLC; Tower Computer Services, Inc.; Wall Street Realty Capital, Inc.; World Trade Farmers Market, Inc.; Adem Arici; Omer Ipek; MVN Associates, Inc.; Marsha Van Name; Daniel D'Aquila; and Floyd Van Name.

[3] The Aviation Defendants are American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corporation; US Airways, Inc.; US Airways Group, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Huntleigh USA Corporation; ICTS International N.V.; The Boeing Company; Massachusetts Port Authority; Burns International Security Services Company, LLC (formerly known as Burns International Security Services Corporation); Burns International Services Company, LLC (formerly known as Burns International Services Corporation); Pinkerton's LLC (formerly known as Pinkerton's Inc.); and Securitas AB.

[4] The parties move for several orders relating to approval of the settlement: (1) an order approving the settlement agreement and the settlement amount as consistent with Air Transportation Safety and System Stabilization Act ("ATSSSA") as it applies to the Aviation Defendants, the settling plaintiffs, and any other actual or potential claimants; (2) an order holding that all amounts paid pursuant to the settlement agreement are to be credited against each respective paying Aviation Defendant's limit of liability established by Section 408(a)(1) of the ATSSSA (including approval of settlement payments among the paying Aviation Defendants; (3) an order dismissing each of the settling plaintiffs' actions with prejudice as to all Aviation Defendants; (4) an order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure directing entry of a final judgment in each of the settling plaintiff's actions in accordance with the terms of the Settlement Agreement; and (5) a finding or order that payment by Huntleigh USA Corp.'s ("Huntleigh") insurers has exhausted the limits of Huntleigh's liability insurance coverage and that the payment is to be credited against Huntleigh's limits of liability under Section 408(a)(1) of the ATSSSA.

[5] The WTCP Plaintiffs are World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as "5 World Trade Center LLC") and 4 World Trade Center LLC.  World Trade Center Properties LLC, 2 World Trade Center LLC and 4 World Trade Center LLC are plaintiffs in 08 CIV 3719 (AKH).  World Trade Center Properties LLC, 1 World Trade Center LLC, 3 World Trade Center LLC and 7 World Trade Company, L.P. are plaintiffs in 08 CIV 3722 (AKH).

## I. Background

### a. The ATSSSA

Congress passed the ATSSSA in the immediate aftermath of the September 11 terrorist attacks to prevent the exposure of the American aviation industry to ruinous liability threatening to compromise the integrity of the industry and to provide just compensation to victims and their families.

The liability provisions of the bill were intended to prevent "two unsatisfactory outcomes: (1) that the airlines, whose liability insurance coverage is insufficient to cover all damage, would be dissolved as their assets were sold to pay off their liability and/or; (2) some or all of the victims who were injured or killed in this tragedy would receive no compensation." See 147 Cong. Rec. S9589-01, S9594 (Sept. 21, 2001) (statement of Senator McCain). The ATSSSA provided a liability cap applicable to any "air carrier, aircraft manufacturer, [or] airport sponsor" for any claims "arising from the terrorist-related aircraft crashes of September 11, 2001," including claims for wrongful death, personal injury, and property damage. ATSSSA § 408(a)(1). The ATSSSA provided also for a Victim Compensation Fund, administered by a Special Master appointed by the Department of Justice to develop regulations and to provide recoveries from Federal funds to the families of those who died, and to those who suffered personal injuries from the terrorist-related aircraft crashes of September 11, 2001, without the need to prove fault or face the complications, risks, and delays of litigation. See id. §§ 401-407. Claimants eligible for the Victim Compensation Fund were given a choice between the Fund and traditional lawsuits. Id. § 405(c)(3)(B). All lawsuits "resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001" were to be brought in the United States District Court for the Southern District of New York, which was given exclusive jurisdiction over all

such claims.  Id. § 408(b)(3).  The law to be applied was to be "derived from the law, including

the choice of law principles, of the State in which the crash occurred unless such law is

inconsistent with or preempted by federal law."  Id. § 408(b)(2).

### b. The Litigation and the Settlement Process

Two sets of claimants filed suit against the Aviation Defendants, those alleging

personal injury and wrongful death claims and those alleging subrogated and uninsured property

damage claims.

### i. The Wrongful Death and Personal Injury Cases

I established procedures to govern the settlement process in the wrongful death

and personal injury cases in a Stipulation and Order issued April 10, 2006.  The procedures were

to ensure the fairness of each settlement in light of the ATSSSA's liability cap and give all

parties with claims against the Aviation Defendants the opportunity to object.  See In re Sept. 11

Litig., 600 F. Supp. 2d 549, 552-53 (S.D.N.Y. 2009) ("Because each settlement recovery would

erode a limited pool of insurance resources, a procedure of court approvals was provided to

assure fairness.").

With the assistance of Sheila L. Birnbaum, Esq., the mediator proposed by the

parties and appointed by me, all but three of the wrongful death and personal injury claimants

settled.[6]  Id. (describing settlement process and approving and incorporating mediator's report).

Most settlements were judicially approved as fair and reasonable; several were disapproved

because they were disproportionately large and were not approved until the parties renegotiated.

See Id. at 558-59; In re Sept. 11 Litig., 21 MC 101 (AKH), 2008 U.S. Dist. LEXIS 103894

(S.D.N.Y. Aug. 28, 2008); In re Sept. 11 Litig., 567 F. Supp. 2d 611 (S.D.N.Y. 2008).

---

[6] Motions for approval of settlements in two of the three remaining wrongful death actions, Keating v. American
Airlines, Inc., et al., 02 Civ. 7156 (AKH), and Low v. U.S. Airways, Inc., et al., 03 Civ. 7040 (AKH), are currently
pending before me.

### ii. The Settling Property Damage Cases

In the property damage cases, while the parties engaged in substantial liability discovery, the Aviation Defendants, the subrogated insurer plaintiffs, and certain uninsured property damage plaintiffs, in response to my prodding, developed and implemented a protocol to conduct informal damages discovery that would assist mediation of the claims. The protocol was intended to cut through formal discovery of damages and streamline trial. It built on the Damages Disclosure Forms ("DDFs") and supporting documentation that I ordered produced on April 7, 2005. The DDFs detailed each plaintiff's maximum claimed amounts and included claims-adjustment forms for each subrogation plaintiff's underlying claim, as well as all documents supporting each uninsured plaintiff's claim. The Protocol Order, issued May 22, 2008, addressed all the subrogation plaintiffs' claims and all uninsured loss claims with the exception of those asserted by the WTCP Plaintiffs, the Port Authority of New York and New Jersey ("Port Authority"), and Koudis International, Inc. ("Koudis").[7]

Between May 2008 and September 2009, the Aviation Defendants and the settling plaintiffs engaged in the protocol process with the assistance of a mediator they selected, retired United States District Court Judge John Martin. All proceedings were conducted pursuant to a confidentiality agreement Judge Martin and the parties signed. The Aviation Defendants examined over a million pages of documents regarding the individual settling plaintiffs' damages claims, and experts on both sides held dozens of meetings to review the claims. The parties submitted briefs disputing the value of the settling plaintiffs' damages and argued their positions before Judge Martin, who provided preliminary views. The process provided a common basis

---

[7] The Port Authority and Koudis voluntarily dismissed their claims with prejudice by stipulation. I endorsed these stipulations on September 22, 2009, and February 8, 2010, respectively.

for evaluating claims in mediation, eventually resulting in the agreement that is the subject of the motion before me.

Until September 2009, the parties proceeded in dual fashion, pursuing both negotiations and mediation, and pre-trial discovery.  In July 2009, I ruled on a spate of evidentiary issues to limit the scope and define the issues remaining to be discovered.  See In re Sept. 11 Litig., 621 F. Supp. 2d 131 (S.D.N.Y. 2009).  The parties proposed a case management order to establish a schedule for continuing discovery, but I rejected their proposal because of the delays and unnecessary proceedings that the parties contemplated, and directed the parties to mediate their claims before Judge Martin.

The mediation began in October 2009 with informal discussions among the parties, their counsel, and Judge Martin, as well as extensive briefing on issues of liability, and categories of recoverable damages.  Representatives and counsel for the settling plaintiffs, the contributing insurers, and the Aviation Defendants whose insurers were to contribute to the settlement attended over two weeks of formal mediation sessions before Judge Martin.  The sessions began with oral presentations of factual and legal liability issues.  The settling plaintiffs argued that the Aviation Defendants had performed their duties to screen passengers and their belongings negligently on the morning of September 11, 2001, and that their negligence proximately caused the damage incurred by the plaintiffs.  The Aviation Defendants took the position that they had strong defenses to liability which warranted substantial discounts of plaintiffs' claimed damages.  Judge Martin questioned counsel on the factual and legal support for their arguments.

Near the end of the second week of formal mediation sessions, Judge Martin communicated his belief that the parties remained apart and proposed an amount, in the

7

aggregate, which he believed would create reasonable settlement of the claims of all participating

plaintiffs. The proposed amount, $1.2 billion, represented a 72% discount from the settling

plaintiffs' total claimed damages of $4.4 billion. The discount was based on factors common to

all settling parties, including the risk and expense of a trial, and the ability to resolve the case

without any party claiming victory or admitting liability. After further informal discussions, all

parties accepted Judge Martin's recommendation. The parties signed an agreement on February

23, 2010, and filed this motion for approval on February 25.

### iii. The WTCP Plaintiffs' Cases

At a status conference on March 18, 2008, during which I discussed the protocol

that led to the settling parties' agreement, I also directed the WTCP Plaintiffs to enter into a

separate protocol with the Aviation Defendants. Conf. Tr. at 37-46 (March 18, 2008). The

WTCP Plaintiffs claimed different categories and quanta of injuries from the other defendants,

and were not similarly situated to them. Although the Aviation Defendants expressed reluctance

to enter into settlement negotiations with the WTCP Plaintiffs, I urged them to do so on a

separate track. It became clear, also, that there were substantial differences concerning the size

and scope of their claims, and the parties wished to test the legal criteria for evaluating these

claims. I invited motions.

The Aviation Defendants filed motions to limit the amounts that the WTCP

Plaintiffs could recover, and I had the benefit of briefs and arguments from both sides. In a

series of opinions and orders, I held (1) that the WTCP Plaintiffs' recovery against the Aviation

Defendants for the destruction of World Trade Center Towers 1, 2, 4, and 5 is limited to the fair

market value of its net leasehold interests in the Towers at the time of their destruction, and not

the much higher alleged replacement value, In re Sept. 11 Litig., 590 F. Supp. 2d 535, 540-47

(S.D.N.Y. 2008); (2) that the WTCP Plaintiffs failed to show that the market value had changed between the time they purchased the leaseholds for $2.805 billion on July 16, 2001, and the September 11, 2001 terrorist attacks, In re Sept. 11 Litig., No. 21 MC 101 (AKH), 2009 WL 1181057, at *4 (S.D.N.Y. 2009); and (3) that the WTCP Plaintiffs' insurance recovery was approximately $4.1 billion and could be the basis of a motion for collateral setoff under NY C.P.L.R. § 4545 if expert testimony were to be introduced to show correspondence with potential tort recoveries. See Summary Order Regarding Motion for Collateral Setoff and Summary Judgment, In re Sept. Litig., No. 21 MC 101 (AKH) (Doc. No. 945) (S.D.N.Y. Sept. 30, 2009).

The WTCP Plaintiffs moved for an order certifying for interlocutory appeal these orders and decisions. I denied their motion, holding that the issue was fact-intensive and an appeal on an incomplete record would yield few benefits, and were outweighed by the inevitable delay that would result, not only to the other property damage cases but also to the remaining wrongful death actions. In re Sept. 11 Litig., No. 21 MC 101 (AKH), 2009 WL 2058385, at *1 (S.D.N.Y. May 26, 2009).

Judge Martin remained in contact with the WTCP Plaintiffs and the Aviation Defendants and there were further negotiations, but he determined that the parties remained too far apart and that further mediation was not likely to succeed. See Declaration of John S. Martin, Jr. ("Martin Decl.") ¶ 9. The settling parties' motion to approve their proposed settlement, and the objections of the WTCP Plaintiffs followed.

The WTCP Plaintiffs argue that I should deny the motion for approval of the settlement on three primary grounds: (1) the liability cap provided under ATSSSA § 408(a)(1) creates a "limited fund" for each defendant, preventing me from approving any settlement until all claims against each fund are liquidated via judgment or settlement and each claimant's

9

equitable share is determined, (2) the settlement process was shrouded in secrecy and resulted in

a lump sum figure that was the product of collusion between insurers with interests on both sides

of the negotiating table and which obfuscates the true value of each settled claim, preventing the

court from determining the substantive reasonableness of the settlement amounts, and (3) the

allocation of settlement contributions based on reasons other than liability, and the use of

settlement funds to pay attorney's fees, are contrary to the purpose of the ATSSSA's liability

cap.[8]

## II. Discussion

### a. The WTCP Plaintiffs' Argument that a Liability Ceiling creates a Limited Fund

The WTCP Plaintiffs argue that where a number of claims potentially exceed a

limited fund, it would violate due process and be inconsistent with the ATSSSA to liquidate

particular claims without liquidating all claims and providing each claimant with an equitable

share of the fund. They argue that, because the ATSSSA limits the liability of the Aviation

Defendants to their respective insurance coverage as of September 11, 2001, each Aviation

Defendant's insurance coverage is the equivalent of a limited fund and every claimant is entitled

to an equitable share of that limited fund.

However, a limitation of liability is not a fund. The ATSSSA does not require the

Aviation Defendants or their insurers to pay claimants. Unlike the Victims Compensation Fund,

claimants at law could end up with no recovery at all. See 147 Cong. Rec. S9589-01, S9494

---

[8] The WTCP Plaintiffs also cross-moved for a preliminary injunction prohibiting the settling parties from distributing settlement monies until all appeals are exhausted. The parties resolved the WTCP Plaintiffs' cross-motion by stipulation dated May 5, 2010. The stipulation provided that the settling parties, if they intend to distribute settlement monies prior to the exhaustion of all appeals, will provide fourteen days advance notice to the WTCP Plaintiffs and to the Court. In addition, several Silverstein affiliates who are defendants in a lawsuit arising out of the collapse of Tower 7 filed a "conditional objection" stating that they would consent to approval of the settlement agreement only if I preserve their right to obtain a jury determination, in the event of a trial, on apportionment of fault under § 15-108 of New York General Obligations Law. The parties have resolved this objection by stipulation as reported to the Court during the May 27, 2010 oral argument on the settling parties' motion for approval.

(2001) (recognizing that courts could determine that airlines and any potential corporate

defendants are not liable for harm caused by terrorist-related aircraft crashes of September 11,

2001, and that there might be more claims than insurance capable of paying them).

          Under New York law, which governs these suits unless inconsistent with or

preempted by Federal law, see ATSSSA § 408(b)(2), an insurer has discretion to settle one or

more claims against it even if doing so may jeopardize the ability of later recovering or settling

plaintiffs to collect on their claims, as long as the insurer does so in good faith and there are no

statutory prohibitions against such settlements. "As long as [the insurer] does not act in bad

faith, an insurer has no duty to pay out claims ratably and/or consolidate them." Allstate

Insurance Co. v. Russel, 788 N.Y.S.2d 401, 402 (App. Div. 2004). In Allstate, the insurer settled

with two of the three claimants who were injured in an automobile accident, exhausting the

policy limits. Id. The third claimant demanded arbitration of his claim, but the insurer, having

exhausted its policy obligations, obtained a stay. Id. The Appellate Division held that the

insurer was entitled to a stay of arbitration because "it had exhausted its policy limits . . . by

payments to two other injured passengers." Id.; see also STV Group, Inc. v. Am. Cont'l Props.,

Inc., 650 N.Y.S.2d 204, 205 (App. Div. 1996) ("An insurer may settle with less than all of the

claimants under a particular policy even if such settlement exhausts the policy proceeds." (citing

Duprey v. Sec. Mut. Cas. Co., 256 N.Y.S.2d 987 (App. Div. 1965))); Pisciotta v. Preston, 10

N.Y.S.2d 44, 46 (Sup. Ct. 1938) ("In the final analysis this Court may not rewrite the policy of

insurance to include a clause providing for the ratable distribution of the amount limited by the

policy in the event that more than one person is injured in a single accident."). Bankruptcy

courts in this district have applied the same rule. In re Drexel Burnham Lambert Group, Inc.,

134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("[T]o impose a duty upon an insurer to ascertain all

claims under a policy before settling any claims, and to require the insurer to settle individual claims at its peril is contrary to the policy of encouraging compromise and speedy settlement, and turns legal common sense on its head.").

The law in New York regarding insurers' discretion to settle on a first-come first-served basis is the conventional rule. See 70 A.L.R.2d 416 §2a (2009) ("[I]t has been generally held that a liability insurer can settle with some claimants although to do so may exhaust the insurance fund or so deplete it so that a subsequent judgment creditor is unable to collect his judgment in full from the remaining proceeds."); 46A C.J.S. Insurance § 2318 (2009) ("Where there is no statutory provision which is applicable and there is no pro rata provision in the policy, the contest of multiple plaintiffs for the limited assets of a common uninsured defendant is generally solved in terms of chronological priority, that is, first in time, first in right, so that an insurance company which settles with some injured parties is liable only for the remainder of the policy limits even though it may have been aware that the total claims would probably exceed the policy limits.").

The WTCP Plaintiffs seek to distinguish these clear statements of New York law by arguing from the analogy of a common fund. In Ortiz v. Fibreboard, the Supreme Court addressed the requirements for "limited fund" class action certification under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure and outlined certain traditional characteristics of a limited fund. 527 U.S. 815, 838-65 (1999). The Court made clear that a limited fund was one which was to be "devoted to the overwhelming claims" against it. Id. at 839. The ATSSSA's liability cap does not require the Aviation Defendants to pay out any amounts. It was intended to protect them from liability, not to ensure that claimants are compensated. The only portion of the ATSSSA that provided for guaranteed recoveries was the Victim Compensation Fund, and

12

property damage claimants were excluded from participation. There is nothing in the legislation supporting the WTCP Plaintiffs' limited fund argument.

Moreover, the argument of the WTCP Plaintiffs would prevent multi-party lawsuits like this from being managed efficiently. No party would be able to settle, for a court would have to wait until the claims of the last holdout plaintiff were adjudicated and all appeals exhausted before it could approve any settlement. That is not how a complicated multi-party litigation should be managed, nor how this litigation has been managed. The protocol established early in the history of these cases, see In re September 11 Litig., Stipulation and Order Regarding Settlements, 21 MC 101 (AKH), (Doc. No. 82) (S.D.N.Y. April 10, 2006), and agreed to by all, including the WTCP Plaintiffs, has encouraged each case to settle upon agreement between the particular plaintiff and the Aviation Defendants and a finding of reasonableness by the Court. Ninety-two of ninety-five wrongful death actions have settled, with all affected Aviation Defendants having been released and discharged from further liability, and their settlement payouts having been credited against their respective overall caps. No reason has been given to justify an exception for the property damage cases.

### b. The WTCP Plaintiffs' Arguments of Secrecy and Collusion

The WTCP Plaintiffs argue that the settlement process was "shrouded in secrecy;" that the settlement amounts were collusive with insurers having interests on both sides of the negotiation; and that the settlement in an aggregate amount prevents the court from evaluating its reasonableness. The arguments are without merit.

Judge Martin's declaration attests to the hard-fought, arms-length, and good faith negotiations that led to the settling parties' agreement. Martin Decl. ¶¶ 7-9. The parties engaged in extensive discovery on the issues of both liability and damages. Motion practice testing the

13

limits of relevance and admissibility was hard fought, and resulted in a number of important rulings. See In re September 11 Litig., 621 F. Supp. 2d 131 (S.D.N.Y. 2009). The practice before me was followed by extensive briefings and arguments to Judge Martin, and still the parties remained at impasse. The agreement of the parties reflects Judge Martin's hard work, intelligence and resourcefulness. It was his number, not numbers proposed by the parties, which resulted in agreement. There was no collusiveness and no illegitimate secrecy, and alleged commonality of some insurers had no affect on the settlement. The insurers with the largest stakes on both sides did not participate in negotiations, id. ¶ 8, and, as Judge Martin attests, "[t]here was no evidence that any of the parties was softening its position on a proper settlement amount for some interest other than its own." Id. The WTCP Plaintiffs' allegations of collusion are conjectural and contradicted by the evidence.

Contrary to the WTCP Plaintiffs' assertions, the fact that the settlement is expressed as an aggregate number, applicable to all settlement claims, for distribution to each claimant, does not prevent me from evaluating fairness and reasonableness. The mediation process involved substantial consideration of the legal and factual support for the settling plaintiffs' damages claims and the settlement amount reflects, approximately, a 72% discount from the settling plaintiffs' original claims, from $4.4 billion in damages, as determined through the damages protocol process, to a settlement of $1.2 billion.

Settlements have to be practical and, as Judge Martin describes, if each claim had to be negotiated separately with each set of counsel, the negotiations would have been much more protracted and expensive. Id. ¶ 11. "All of the parties to the agreement recognized that the assessment of damages on an underlying claim by claim and defendant by defendant basis could not have been done in any reasonable amount of time and without substantial cost." Id. ¶ 12.

14

Invidious comparisons among claimants inevitably would have been drawn, and the parties and counsel would have been led into contests of competitiveness, attempting to distinguish and improve one claim in relation to another. The parties agreed to a settlement in an aggregate amount in order to avoid these issues.

      The WTCP Plaintiffs give no reason why a settlement should not be made in the aggregate, or why the aggregate settlement amount is itself unreasonable. Nor should there be any difficulty in distributing the settlement proceeds to specific claims according to a common and objective ratio of distribution. I find that the amount of the settlement and the deep 72% discount of claims fairly reflected the parties' perceptions of the merits, the difficulties in marshaling proofs, the difficulties in proving damages, and other risks inherent in court and trial processes. I find that the settlement is fair and reasonable in the aggregate and as it will be distributed.

### c. The WTCP Plaintiffs' Objections to Insurers' Allocations

      The WTCP Plaintiffs object to (i) the allocation of settlement payments among the contributing insurers, and (ii) the use of settlement proceeds to pay plaintiffs' attorneys' fees.[9]

---

[9] The WTCP Plaintiffs also object based on their argument that the "made whole" doctrine precludes their subrogated insurers from recovering settlement monies before the WTCP Plaintiffs have been fully compensated. They rely on Fasso v. Doerr, in which the New York Court of Appeals noted that "[i]f the sources of recovery ultimately available are inadequate to fully compensate the insured for its losses, then the insurer—who has been paid by the insured to assume the risk of loss—has no right to share in the proceeds of the insured's recovery from the tortfeasor." 12 N.Y.3d 80, 87 (2009). This, however, is not the case here. The subrogated insurers are not sharing in proceeds received by, or owed to, the WTCP Plaintiffs. The WTCP Plaintiffs have yet to establish entitlement to any recovery from the Aviation Defendants. A subrogee need not "delay seeking recovery from the tortfeasor until the insured has exhausted its efforts to collect from the . . . tortfeasor" for there "will be time enough to determine [the insured's] rights vis-a-vis [the subrogee's] when and if it is determined that the . . . tortfeasor is unable to pay the remainder of the[ insured's] loss." Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577, 583-84 (1995). The WTCP Plaintiffs can, and have, brought actions against their subrogated insurers to recover any proceeds of this settlement that are due to them under their insurance policies. See World Trade Center Properties, LLC, et al. v. Great Lakes Reinsurance (UK) PLC, et al., 10 Civ. 1462 (AKH) (S.D.N.Y. filed March 1, 2010); Industrial Risk Insurers v. 7 World Trade Center, L.P., No. 10 Civ. 8036 (AKH) (S.D.N.Y. filed April 8, 2010).

The WTCP Plaintiffs argue that the fairness of settlements should be measured against each Aviation Defendant's relative culpability, for otherwise the limitations of liability provided by the ATSSSA might protect defendants disproportionately. The argument is without merit, for it would prevent settlements until after a trial determines levels of culpability. This is not the law, particularly where the Aviation Defendants firmly deny their liability, and there has been no ruling to suggest liability. Settlements do not have to be negotiated claim by claim, or defendant by defendant. One strong motivation for this settlement, animating both plaintiffs and defendants, is to avoid the risks, expenses and delays of a trial.

There is no basis to argue that the allocations decided by the Aviation Defendants were made in bad faith. The Aviation Defendants represented that they had determined that approximately 60% of the property damage claims related to American Flight 11 and 40% to United Flight 175, leading to a proportionate division among the respective sets of Aviation Defendants. See Supplemental Declaration of Desmond T. Barry, Jr. ("Supp. Barry Decl.") ¶¶ 27-32. They had determined also that the insurers of the airlines and of their respective security companies should bear the cost of settlement, rather than the insurers of the aircraft manufacturers, and I cannot say that that determination also was not a reasonable reflection of relative merits and other practical considerations.[10] Lastly, because of the differences in extent of insurance coverage, proportions of payments among insurers were determined based on proportions of remaining balances of coverage, and I cannot say that that also was not reasonable. In all, I find that the determinations made by the carriers for allocations among them were reasonable and in good faith.

---

[10] The WTCP Plaintiffs contest the procuring of releases for the benefit of non-paying defendants. There are practical reasons to procure such releases, if only to end exposures, cross-claims and continuing discovery obligations should litigation against non-paying parties continue. Procuring of releases by settling parties, in favor of non-settling parties, is not uncommon in large, multi-party cases.

16

The WTCP Plaintiffs complain that the insurers of the security company responsible for screening passengers boarding United Air Lines Flight 175 at Logan Airport, Huntleigh USA Corp. ("Huntleigh"), will have paid all its coverage and be entitled to a discharge of further liability. Although Huntleigh's contributions to the settlement will exhaust its insurance coverage, see Declaration of Jonathan J. Ross ¶¶ 3-5 and ex. A., this does not prevent me from approving the settlement as fair and reasonable. The WTCP Plaintiffs have not shown that Huntleigh is the only defendant against whom they can prove a case of liability, or a more important defendant than others. In the absence of bad faith, and I find none, the WTCP Plaintiffs' argument is without merit.

Finally, the WTCP Plaintiffs object to crediting against the ATSSSA liability cap amounts that the settling plaintiffs may apply to pay their attorneys fees, because, they argue, these amounts are not paid on account of the Aviation Defendants' liability. However, there is no evidence that fees paid or owed by claimants to attorneys are being paid by the settling defendants' insurers. How the settling plaintiffs use their recoveries has no relevance to the issue of fairness and reasonableness of the settlement. And, unlike the situation of the wrongful death plaintiffs and limitations of contingent fees, I need not scrutinize the particular fee arrangements of each settling plaintiff and its attorneys, whether based on time rates or contingencies, for these are sophisticated companies accustomed to commercial arrangements with counsel and large and expensive lawsuits. The overall fairness of the settlement amount, which reflected a 72% discount from the settling plaintiffs' claims, along with the hard-fought negotiations and mediation that led to the settlement, and the fact that Judge Martin proposed the amount to which the settling parties eventually agreed, demonstrates that the settlement figure was not inflated by

17

unreasonable attorney's fees, as were certain wrongful death settlements I rejected. See In re

Sept. 11 Litig., 567 F. Supp. 2d at 620-21.

## III. Conclusion

For the reasons discussed in this Opinion, I grant the settling parties' joint motion

for Orders approving the Settlement Agreement and Mutual Release of Claims dated February

23, 2010.

I find the proposed settlements to be fair, reasonable and consistent with the

ATSSSA, I approve them, I order all amounts paid pursuant to the settlement agreement to be

credited against the settling defendants' respective liability ceilings under § 408(a)(1) of the

ATSSSA, I dismiss each settling plaintiff's claims with prejudice as to all Aviation Defendants, I

direct entry of a final judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure,

in each of the settling plaintiff's actions in accordance with the terms of the settlement

agreement, and I find that payment by Huntleigh's insurers has exhausted the limits of

Huntleigh's liability insurance coverage.

The Clerk shall mark the motion (Doc. No. 1080) as terminated.


SO ORDERED.


Dated:       July 1, 2010
             New York, New York

ALVIN K. HELLERSTEIN
United States District Judge